42 F.3d 204
 63 USLW 2460, Fed. Sec. L. Rep. P 98,474
 HILLSON PARTNERS LIMITED PARTNERSHIP, Plaintiff-Appellant,
v.
ADAGE, INCORPORATED; Donald F.U. Goebert; Robert H.
Cahill; Robert T. Holland; Robert L. MacDonald;
Philip B. Ryan; Buck Scott; Ralph R.
Whitney, Jr., Defendants-Appellees.
 No. 94-1186.
 United States Court of Appeals,
Fourth Circuit.
 Argued Sept. 29, 1994.
Decided Dec. 13, 1994.
 
 ARGUED: Susan B. Bovee, Finkelstein, Thompson & Loughran, Washington, DC, for appellant. Joseph O. Click, Dryer, Ellis, Joseph & Mills, Washington, DC, for appellees. ON BRIEF: Burton H. Finkelstein, Lisa E. Boehley, Finkelstein, Thompson & Loughran, Washington, DC, for appellant. Michael Joseph, Richard A. Kirby, Dryer, Ellis, Joseph & Mills, Washington, DC, for appellees.
 Before MICHAEL and MOTZ, Circuit Judges, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.
 Affirmed by published opinion. Judge MOTZ wrote the opinion, in which Circuit Judge MICHAEL and District Judge MICHAEL joined.
 OPINION
 MOTZ, Circuit Judge:
 
 
 1
 In this case we are again called upon to determine whether a company's statements as to its business prospects constitute false statements or omissions of material fact actionable under the securities laws. Because we conclude that the statements at issue here neither misstated nor omitted material facts, we affirm the district court's dismissal of the complaint.
 
 I.
 
 2
 Adage, Inc. is a publicly traded Pennsylvania corporation; its stock is listed on the NASDAQ National Market System. Through its subsidiaries, including Allister Access Controls, Inc. and Fort Orange Paper Company, Adage is involved in the businesses of specialty manufacturing, including electronics, steel processing, and recycled paper manufacturing, and real estate development and management. The president and chief executive officer of Adage at all times relevant to this lawsuit was Robert H. Cahill. The statements at the heart of this dispute were made during the period from April, 1992 through December, 1992 and concern Adage, Allister, and Fort Orange.
 
 
 3
 In an April 30, 1992 press report, Cahill was quoted as telling a group of security analysts that Adage "expects to report revenue increases" for its first quarter, ending March 31, 1992. Cahill was further quoted as attributing the increases in first quarter revenues in part to "improved performance in the Allister electronic access controls division."
 
 
 4
 On May 5, 1992, Adage issued its first quarter report in which it reported net income from continuing operations for the first quarter of 1992 of $505,000, a 45% increase over the first quarter of 1991. It attributed this increase to decreased expenses because of restructuring, "attention to detail in quality at all levels of operations," and the acquisition of a new subsidiary, RELM Communications, that increased working capital by $9.5 million. With regard to the Allister subsidiary, the report noted that:
 
 
 5
 Allister Access Controls has reduced costs and improved its gross margins. Significant sales gains should be seen as the year progresses. Additionally, as Allister's electronic components are produced by RELM, Adage's financial situation will improve.
 
 As to Fort Orange, the report stated:
 
 6
 Fort Orange Paper Company continues its excellent performance. We expect these results only to improve with the savings from the cogeneration plant expected to begin this summer, the rebuilding of the forming end of the paper machine which will increase capacity by 14%, and the increased efficiency and capacity of the new 8 color press which will enhance our quality.
 
 
 7
 In a press release also issued on May 5, 1992, Cahill was quoted as saying that he was "pleased to see the current year get off to the good start we had previously forecast. This strengthens our conviction that 1992 will produce excellent results for Adage." Cahill again attributed positive first quarter earnings to decreased expenses and noted that "[i]n addition, the results reflect improvement at the Allister electronic access controls subsidiary as well as net income from RELM."
 
 
 8
 In a May 19, 1992 press release, Cahill is quoted as telling shareholders attending the company's annual meeting that Adage "is on target toward achieving the most profitable year in its history and expects to exceed, by a comfortable margin, its previous net income record of $1.7 million set in 1990;" this result was attributed to the acquisition of RELM. The May 19 press release also stated:
 
 
 9
 Later this year we are expecting the cogeneration plant at our Fort Orange Paper Company subsidiary to begin operating and yield annual savings on steam costs of $1 million pre-tax. Additional improvements to the mill scheduled for August will increase capacity by 14% adding another $1.8 million in pre-tax profits. On an annualized basis these two events will generate an additional $.32 per share to our bottom line.
 
 
 10
 On August 11, 1992, Adage released its report for the second quarter, ending June 30, 1992. The report noted that "Adage is in the midst of an excellent year. We are on track to exceed 1990, our record year for net income." It further stated that although "this profitability is in the face of dire economic conditions facing the housing industry upon which [Allister's] sales of residential garage door openers are dependent. With improvement in the housing segment, Allister's operation should significantly improve." The quarterly report also stated that "[t]he rebuilding of the Fort Orange paper machine, that will result in a 14% increase in capacity, is on schedule...." That same day Adage issued a press release in which it stated that the record second quarter and first half results kept the company "on track toward reaching its previously forecast goal of record full year profits." Adage reported net income of $506,000 for the second quarter of 1992, an enormous increase over the $435,000 net loss for the second quarter of 1991, bringing its net income for the first six months of 1992 to $1.01 million, a 617% increase over the $141,000 net income for the first six months of 1991.
 
 
 11
 On November 4, 1992, Adage announced in a press release that during the previous week it had dismissed the president and six high ranking executives of Allister. Cahill is quoted as explaining:
 
 
 12
 The termination of these executives will result in annual savings of approximately $750,000 for Allister which lost $1.2 million on revenues of $6.7 million for the six months ended June 30, 1992. Returning Allister to profitability is an important priority for Adage at this time. This reduction in personnel along with other cost saving measures we have implemented should significantly improve Allister's performance.
 
 
 13
 Eleven days later, on November 13, 1992, Adage released its report for the third quarter, ending September 30, 1992, in which it reported a net loss of $153,000, against $153,000 in net income for the third quarter of 1991; this loss was despite third quarter revenues in excess of $24 million, a 31% increase in revenues over the $18 million reported for the same quarter in 1991. The report explained that Adage's "plan for steady progress in revenues and earnings this year was briefly interrupted due to a decision to postpone short term gains in favor of long term benefits" at Fort Orange:
 
 
 14
 Unfortunately the installation [of the forming section for the paper machine] took longer than planned and we were not only out of operation at the paper mill for two weeks in August but also only running at half capacity during the month of September. Without Fort Orange's usual contribution to profit, we were only marginally profitable and did not make our plan.
 
 
 15
 In the third quarter report, Cahill also attributed Adage's "disappointing" third-quarter performance to "continued unsatisfactory performance at the Allister Access Controls subsidiary." He noted that Allister "has been underperforming for more than two years," that "nine recently appointed senior and middle management personnel" had been removed as of October 30, and that this "management change will produce annual savings of $825,000." The report concluded that "[w]ith Fort Orange back operating at improved rates ... [and] reduced costs at Allister we should have an excellent fourth quarter and see significant improvements during 1993."
 
 
 16
 Two weeks before the end of the fourth quarter, on December 15, 1992, the Wall Street Journal reported in an article headlined "Adage Expects Quarter and Year to Improve Upon 1991 Results":
 
 
 17
 Adage Inc. expects to have a better fourth quarter and year in sales and overall net income than a year ago, said Robert H. Cahill, president. Calling 1992 a transition year, Mr. Cahill said 1993 would be "a very good year" for Adage.
 
 
 18
 The article further stated that "[t]he executive is looking for 1992 sales of about $100 million, and 1993 sales of about $110 million." On March 5, 1993, Adage issued its fourth quarter and year end reports. For the fourth quarter, in fact, Adage reported net income of $231,000, an increase of $384,000 over the third quarter of 1992, but a decrease of $97,000 over that reported during the fourth quarter of 1991. For the year, it reported sales of $97,863,000 as against $75,044,000 in sales in 1991; and net income of $1,089,000, a 75% increase over the net income of $622,000 for 1991, but $700,000 less than the net income for 1990.
 
 
 19
 On August 9, 1993, Hillson Partners Limited Partnership filed this class action against Adage, Cahill, and other officers of Adage, on behalf of those who purchased Adage common stock between April 30, 1992 and March 9, 1993. The complaint alleges that the statements described above concerning Adage and its subsidiaries were materially false and misleading, and so violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (Exchange Act),[1] 15 U.S.C. Secs. 78j(b), 78t(a); Rule 10b-5 promulgated thereunder, 17 C.F.R. Sec. 240.10b-5;[2] and the Maryland Securities Act; and further constituted the torts of fraud and negligent misrepresentation.
 
 
 20
 The complaint alleges that after Adage disclosed its 1992 year end results on Friday, March 5, 1993, the per share purchase price of its common stock, which had traded at a high of $6.37 and at an average of $5.09 during the period of April 30, 1992 through March 8, 1993, dropped to $4.25 by Tuesday, March 9, 1993. Certain of Adage's officers and directors, including Cahill, are alleged to be parties to a Contingent Share Agreement, which entitled them to receive up to 2,390,305 shares of Adage's common stock held in escrow, or about 46% of the then outstanding shares, if the stock price was maintained at certain levels over any ninety day period prior to August 27, 1993.[3] Approximately 1,833,200 shares of Adage common stock were publicly traded from April 30, 1992 through March 9, 1993, 89,000 of which were purchased by Hillson on various occasions. A total of 5,225,620 shares of Adage's common stock were outstanding during the period from April, 1992 through March, 1993.
 
 
 21
 The district court granted Adage's motion to dismiss Hillson's complaint for failure to state a claim upon which relief can be granted. Specifically, the district court concluded that Cahill's statements as to Adage's expected overall performance in 1992 and as to Allister's performance were not sufficiently material to support claims for securities fraud and that Hillson had failed to allege any damages resulting from Cahill's statements as to Fort Orange. After dismissing Hillson's federal claims, the district court declined to exercise its jurisdiction over the pendent state law claims and dismissed them as well.
 
 II.
 
 22
 To establish liability under Sec. 10(b) and Rule 10b-5, a plaintiff must prove: (1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages. Cooke v. Manufactured Homes, Inc., 998 F.2d 1256, 1260-61 (4th Cir.1993). Accord Malone v. Microdyne Corp., 26 F.3d 471, 476 (4th Cir.1994); Myers v. Finkle, 950 F.2d 165, 167 (4th Cir.1991); Schatz v. Rosenberg, 943 F.2d 485, 489 (4th Cir.1991), cert. denied sub nom., Schatz v. Weinberg & Green, --- U.S. ----, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992).
 
 
 23
 The critical concern in the case at hand is the first of these factors, which itself has two components: (a) a false statement or omission of a fact (b) that is material. In Basic Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Supreme Court set forth the starting point for any analysis of this factor. There the Court devoted much of its attention to the "materiality requirement" and held that in order "to fulfill the materiality requirement" in the Sec. 10(b) and Rule 10b-5 context "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. at 231-32, 108 S.Ct. at 983 (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). Thus, materiality is a "fact-specific inquiry," which "depends on the significance the reasonable investor would place on the withheld or misrepresented information." Id. at 240, 108 S.Ct. at 988 (footnote omitted). With respect to "contingent or speculative information or events," materiality " 'will depend ... upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.' " Id. at 238, 108 S.Ct. at 987 (quoting SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir.1968) (en banc ), cert. denied sub nom., Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)).
 
 
 24
 In the midst of this discussion of the materiality requirement the Court also emphasized that in order to meet its burden under this first factor "a plaintiff must show that the statements were misleading as to a material fact," id. (emphasis in original), and that "[t]o be actionable, of course, a statement must also be misleading." Id. at 239 n. 17, 108 S.Ct. at 987-88 n. 17. Moreover, all averments of fraud are required by Fed.R.Civ.P. 9(b) to be "stated with particularity." Where fraudulent projections are alleged, the plaintiff must therefore identify in the complaint with specificity some reason why the discrepancy between a company's optimistic projections and its subsequently disappointing results is attributable to fraud. Borow v. nVIEW Corp., 829 F.Supp. 828, 833 (E.D. Va.1993), aff'd mem., 27 F.3d 562 (1994);[4] see also DiLeo v. Ernst & Young, 901 F.2d 624, 627-28 (7th Cir.), cert. denied, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). Mere allegations of "fraud by hindsight" will not satisfy the requirements of Rule 9(b). Borow, 829 F.Supp. at 833 (citing Denny v. Barber, 576 F.2d 465, 470 (2d Cir.1978)); see also Greenstone v. Cambex Corp., 975 F.2d 22, 25-27 (1st Cir.1992) (and cases cited therein).
 
 
 25
 Although for some time there was a question as to whether statements of belief or opinions could constitute statements "with respect to material facts" for purposes of the securities laws, in Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1092-93, 111 S.Ct. 2749, 2758, 115 L.Ed.2d 929 (1991), the Supreme Court made it clear that they can, at least for purposes of Sec. 14(a) of the Exchange Act, provided they are opinions or beliefs as to current facts. This is so because such statements rest on "a factual basis that justifies them as accurate, the absence of which renders them misleading." Id. at 1093, 111 S.Ct. at 2758. Thus, as to the statements at issue in Sandberg, "provable facts either furnish[ed] good reasons" for the directors' statements in recommending a merger, or "count[ed] against it." Id. at 1093, 111 S.Ct. at 2758.
 
 
 26
 Three times in the past sixteen months we have, in published opinions, considered whether a company's statements as to its business prospects are actionable under the securities laws. We did not reach the same ultimate conclusion in these cases, i.e., we did not hold that all of the statements were, or were not, actionable. However, contrary to Hillson's suggestion, we did follow a consistent course in these cases. In each, we either implicitly or explicitly recognized that the above four pronged test was controlling and then examined the pleadings or evidence, depending on the procedural posture of the particular case, to determine if one or more of the above factors were properly pled or sufficiently proved. That course guides us now.
 
 
 27
 First, in Cooke v. Manufactured Homes, we reversed, in part, a grant of summary judgment to the defendant company. In that case, it was undisputed that the company made a number of conflicting statements as to its current financial status. In its annual reports it "disclosed its declining financial status" but at the same time it issued press releases "stating that it was enjoying a degree of financial prosperity." Cooke, 998 F.2d at 1259. Among the statements indicating financial prosperity was the announcement that the company "was planning to repurchase 400,000 shares of its common stock" because the shares were an "attractive investment in light of the Company's strong earnings prospects for the future" and its report that it was "involved in negotiations with an insurance company that would act as a guarantor on its loans." Id. at 1259, 1261. Also in support of its claims of financial prosperity were the company's announcements that it "was looking for record earnings" for the year, that sales were "good," and other soft puffing statements. Id. Hillson argues that these statements were held "material enough to withstand a motion to dismiss." In fact, materiality was not the basis of our holding or that of the district court in Cooke.
 
 
 28
 In granting judgment for the company on the securities law claims, the trial court focused solely on the third factor necessary to such a claim, i.e., reliance. Thus, the district court held that the plaintiffs had not justifiably relied on the company's statements because "any alleged misrepresentations or omissions by [the company] were countered by prolific, contrary information disseminated to the market." Id. at 1258. There was no finding by the district court as to the first factor, i.e., whether there was a misstatement or omission of material fact.
 
 
 29
 Similarly, on appeal, the company apparently did not assert that the statements were not misstatements of material fact. Rather it claimed that the finding as to no justifiable reliance was correct and that "summary judgment was properly granted because the market was apprised of the financial health of the corporation at all relevant times." Id. at 1260. After explaining how the fraud on the market theory, on which the Cooke stockholders relied, relieves a plaintiff of proving "direct reliance," we noted:
 
 
 30
 Appellants assert that the misrepresentations and/or omissions by [the company] created a conflicting mix of information on which the market justifiably relied and that the reliance of the market on this mix of information led to an artificially inflated stock price, thereby giving rise to a genuine issue of fact. Accordingly, they contend that summary judgment was inappropriate. Applying the summary judgment standard, we conclude that ... there was a sufficient total mix of information as to whether any misrepresentations and/or omissions by [the company] were materially misleading to the market. Hence, granting summary judgment against all investors was improper.
 
 
 31
 Id. at 1261. Thus, our focus in Cooke, like that of the district court, was on reliance. Contrary to Hillson's argument, our holding in Cooke cannot be fairly read as a determination of the materiality vel non of any of the challenged statements. We were not asked to, and did not, examine whether the challenged statements were material or misleading.[5]
 
 
 32
 A month after the Cooke decision was issued, we again addressed a claim that certain company statements constituted violations of the securities laws. In Raab v. General Physics Corp., 4 F.3d 286 (4th Cir.1993), however, the district court, the parties, and this Court focused not on the third factor (reliance) but on the first factor: whether the plaintiffs had alleged that the company had made misstatements or omissions of material fact. The district court held that the complaint should be dismissed because it "failed to plead the requisite, non-conclusory specific factual predicate" necessary to allege fraud and because some of the alleged misstatements were not material, i.e., were "no more than puffery." Raab v. General Physics Corp., No. S-92-1741, 1993 WL 358450 (D. Md.1993).
 
 
 33
 On appeal, the parties also focused on this factor; we, in turn, affirmed because we agreed with the district court's conclusion. We held that as to some claims the stockholders did not plead the "specific facts required by Fed.R.Civ.P. 9(b) .... to show that the statements were false." Raab, 4 F.3d at 288, 290. The remaining claims were based on an asserted "failure to disclose the adverse impact of [a] contracting slowdown on first quarter 1992 earnings" and on predictions that "results during the remainder of 1992 should be in line with analysts' current projections" and that "an expected annual growth rate of 10% to 30% over the next several years" with resulting "growth and success" would continue "well into the future." Id. at 288-91. We held that these statements and omissions were not material as a matter of law.
 
 
 34
 Consistent with the Basic materiality formulation, we explained that " '[s]oft,' 'puffing' statements ... generally lack materiality because the market price of a share is not inflated by vague statements predicting growth.... No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market." Id. at 289-90. Moreover, we noted that predictions of future growth "not worded as guarantees are generally not actionable under the federal securities laws." Id. at 290 (quoting Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1446 (5th Cir.1993)). We distinguished expressions of belief or opinion "concerning current facts," that "may be material," see Sandberg, 501 U.S. at 1090-97, 111 S.Ct. at 2757-60, 115 L.Ed.2d 929, from opinions as to uncertain future events, to which the Sandberg analysis does not "extend[ ] so easily." Raab, 4 F.3d at 290 (emphasis in original).
 
 
 35
 Most recently, in Malone v. Microdyne Corp., we examined the claim of certain stockholders that seven company statements constituted violations of the securities laws. The district court entered judgment as a matter of law for the company entirely on the basis of the first factor, "holding that the plaintiffs had presented no evidence that [the company's] statements were false or misleading." Malone, 26 F.3d at 476 (citing Malone v. Microdyne Corp., 824 F.Supp. 65, 66, 68 (E.D.Va.1993)). After carefully examining each of the statements, we concluded that, as to six of them, there was a sufficient evidentiary basis on which a jury could find the company had made false or misleading statements of material fact with scienter. Id. at 478-79. In each of these six statements, issued from April to August of 1992, the company booked and reported items as sold, never disclosing that, in fact, it had given distributors the right to return these items if they could not sell them and never disclosing "the actual return of more than forty percent" of the items reportedly "sold" to distributors. Id. at 473 (emphasis in original).
 
 
 36
 In the seventh statement, the company's president did not make any comments as to past or present sales. Rather, he simply stated, in response to a press inquiry, that he "was comfortable with" an analyst's earnings estimate that the company would earn 80 cents per share in the 1992 fiscal year, which would end in seven months, and $1.05 per share in the 1993 fiscal year, an increase from the 76 cents per share that the company had earned in fiscal year 1991. Id. This prediction, however, did not become reality. Relying on the analysis in Raab, we held that nevertheless it was not actionable as a matter of law because it was neither a guarantee nor specific enough to "perpetrate a fraud on the market." Id. at 479-80. We explained:
 
 
 37
 Misstatements or omissions regarding actual past or present facts are far more likely to be actionable than statements regarding projections of future performance. Generally the latter will be deemed actionable under Sec. 10(b) and Rule 10b-5 only if they are supported by specific statements of fact or are worded as guarantees.
 
 
 38
 Id. at 479 (emphasis in original).
 
 
 39
 With these principles in mind, we turn to the case at hand.
 
 III.
 
 40
 Adage's April and May press releases and first quarter report issued on May 5, 1992 were largely devoted to descriptions of its first quarter results. Those results were reported to be excellent, and Hillson does not allege that this characterization was in any way false or misleading. Hillson does take issue with the statements contained in the press releases and first quarter report that Allister's performance should improve ("significant sales gains should be seen as the year progresses"), that "1992 will produce excellent results for Adage," and that Adage is "on target toward achieving the most profitable year in its history." All of these statements are predictions as to future events; none are statements as to present facts, let alone guarantees. Thus, all of the April and May statements clearly constitute the type of vague predictions of growth that we held in Raab and Malone not to be material as a matter of law.
 
 
 41
 Hillson also challenges the statement made in Adage's second quarter report, issued on August 11, and a press release issued the same day, that Allister's operations "should significantly improve," as painting a fraudulently "rosy picture" in light of Allister's "underperformance" for several years. It seems to us, however, that statements that operations "should improve" signal not a "rosy picture" but recognition that operations have not been "rosy" in the past and the hope ("should") that they will "improve" in the future. Thus, these statements were entirely consistent with Allister's previous underperformance. Like the district court, we believe that the statements regarding Allister were "even more indefinite" than the April and May statements discussed above regarding Adage's expected overall performance. Moreover, all of the projections regarding Allister's improved performance were expressly contingent on other market conditions, including the success of the housing industry. Therefore, consistent with Raab and Malone, none of the statements regarding Allister's performance constituted material misrepresentations sufficient to support a claim for federal securities fraud.
 
 
 42
 Nor did Adage's failure to disclose in more detail Allister's problems constitute an omission of material facts. Those problems had been detailed in Adage's 1992 annual report and on a Form 10K filed by the company in March, 1992. Both the annual report and the 10K disclosed Allister had lost money in each of the three years preceding 1992, including a net operating loss in 1991 alone of more than $1.5 million.[6] "The securities laws require disclosure of information that is not otherwise in the public domain," not information that has already been publicly--indeed, officially--disclosed by the company. Sailors v. Northern States Power Co., 4 F.3d 610, 613 (8th Cir.1993) (quoting Acme Propane, Inc. v. Tenexco, Inc., 844 F.2d 1317, 1323 (7th Cir.1988)) (emphasis added in Sailors); see also Basic, 485 U.S. at 248-49, 108 S.Ct. at 992-93 (presumption of fraud rebutted when market has access to accurate information); Raab, 4 F.3d at 289 ("defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources") (quoting In re Apple Computer Sec. Lit., 886 F.2d 1109, 1115 (9th Cir.1989)). Compare Malone, 26 F.3d at 478 (company never disclosed the actual return of products booked and reported as sold, even though this handling of "sales" violated Financial Accounting Standards and Generally Accepted Accounting Principles).
 
 
 43
 With regard to Fort Orange, Hillson challenges the assertions, also contained in the August 11 statements, that the rebuilding of the Fort Orange paper machine was "on schedule," which, according to Adage's May statements, meant "scheduled for August." Hillson does not allege that Adage made any representations as to how long the rebuilding of the paper machine would take, or that the rebuilding would be problem free. Rather, Hillson's only claim is that there was "no reasonable basis" for the "on schedule" statements of August 11, given that, as Adage acknowledged three months later in its third quarter report:
 
 
 44
 [W]e started planning three years ago to install a new forming section during the 1992 annual two week maintenance shut down. Unfortunately the installation took longer than planned and we were not only out of operation at the paper mill for two weeks in August but also only running at half capacity during the month of September.
 
 
 45
 As the district court recognized, the "on schedule" statements refer to specific, ongoing projects, not general financial projections, like most of the statements in Raab. They are very similar in substance and timing to one of the Raab statements. In Raab, the company in March 30 and April 23 press releases stated that lower first quarter earnings "resulted primarily from administrative delays" in the award of certain government contracts, but that "conditions in the 1st quarter are temporary and that the results during the remainder of ... 1992 should be in line with analysts' current projections." 4 F.3d at 288. The prediction as to the delay in government contracts, like the "on schedule" prediction here, failed to materialize. Although "predictions about earnings for the latter three quarters of 1992 proved incorrect," we concluded that "hindsight does not establish fraud." Id. at 291. That conclusion is also compelled here.
 
 
 46
 Just as the stockholders in Raab did not allege "sufficient nonconclusory facts" showing that the company did not believe the "temporary delay" statement was "accurate at the time" it was made, id. at 290, Hillson did not allege facts showing that Adage did not believe the "on schedule" statement was "accurate at the time" it was made. Indeed, Hillson did not allege any facts indicating that the installation was not actually "on schedule" as of August 11, 1992, let alone any facts that would indicate that on or before August 11 Adage knew, or had reason to know, that the installation would actually be delayed. "[A]n inability to foresee the future does not constitute fraud." Eckstein v. Balcor Film Investors, 8 F.3d 1121, 1132 (7th Cir.1993); see also Denny v. Barber, 576 F.2d at 470.
 
 
 47
 Moreover, the "on schedule" statement was not material. The role of the materiality requirement is not to "attribute to investors a childlike simplicity" but rather to determine whether a " 'reasonable investor' would have considered the omitted information significant at the time." Basic, 485 U.S. at 232-34, 108 S.Ct. at 983-85. A "reasonable investor" knows that a capital improvement project may run into unforeseen problems and delays and would not have considered a statement explaining this to have been "significant." See Raab, 4 F.3d at 291 (no duty to disclose information of common knowledge); Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 515 (7th Cir.1989) (no duty to disclose Murphy's Law or Peter Principle); Borow, 829 F.Supp. at 834 (investors understand development of new product may run into snags resulting in delay).[7] It is "not a violation of any securities law to fail to disclose a result that is obvious even to a person with only an elementary understanding of the stock market." Zerman v. Ball, 735 F.2d 15, 21 (2d Cir.1984) (quoting Vaughn v. Teledyne, Inc., 628 F.2d 1214, 1220 (9th Cir.1980)).[8]
 
 
 48
 In its second quarter report issued on August 11, the company also reported record second quarter and first six months results. Hillson does not allege that the report of these past results was in any way false or misleading. It does challenge a statement in the quarterly report that "Adage is in the midst of an excellent year .... [w]e are on track to exceed 1990, our record year for net income," and, in the press release issued the same day, that record first-half sales and profits were "keeping the company on track toward reaching its previously forecast goal of record full-year profits." Relying on Virginia Bankshares v. Sandberg, Hillson claims that these "on track" statements were "expressions of belief or opinion as to current facts," made without any reasonable basis.
 
 
 49
 To the extent that they were expressions of belief as to current facts, the August "on track" statements clearly had a reasonable basis. Adage's first half results were in fact record-breaking, providing more than a reasonable basis for the belief that the company was "on track" for a record-breaking year. To the extent that the "on target" statements were addressed to the third and fourth quarters, they were not expressions of belief as to current facts, but rather expressions of belief as to uncertain future performance, the very sort of statements that we held in Raab did not lend themselves to the Sandberg analysis. See Raab, 4 F.3d at 290; see also Eckstein, 8 F.3d at 1132 ("intentions and beliefs are 'facts' " for purposes of the securities laws only when "they are open to objective verification"). Indeed, in Raab we discussed why such predictions of future growth cannot constitute the basis for claims under the securities laws:
 
 
 50
 Predictions of future growth ... will almost always prove to be wrong in hindsight. If a company predicts twenty-five percent growth, that is simply the company's best guess as to how the future will play out. As a statistical matter, twenty percent and thirty percent growth are both nearly as likely as twenty-five. If growth proves less than predicted, buyers will sue; if growth proves greater, sellers will sue. Imposing liability would put companies in a whipsaw, with a lawsuit almost a certainty. Such liability would deter companies from discussing their prospects, and the securities markets would be deprived of the information those predictions offer. We believe that this is contrary to the goal of full disclosure underlying the securities laws....
 
 
 51
 Raab, 4 F.3d at 290.
 
 
 52
 Hillson seeks to distinguish Raab because "of the abbreviated time frame in which the events in the Adage case were predicted to occur." Thus, it asserts that Adage had no reasonable basis for making the "on-track" statements six weeks into the third quarter, in which the ultimate results (not reported until November 13, some three months later) were poor. There is nothing in Raab (or Malone) that suggests a prediction of future growth ceases to be a prediction of future growth simply because it is made six weeks rather than six months in advance. Indeed, contrary to Hillson's assertions, as explained above, the timing of the "temporary delay" statement found not to be actionable in Raab is similar (although not identical) to the timing of the "on track" statements here: three weeks into the second quarter, the company in Raab issued a statement, which ultimately proved to be inaccurate, that the delay would be temporary and that results during that quarter and the remainder of the year "should be in line with analyst's projections." Id. at 288 (emphasis added).
 
 
 53
 It may be that under certain circumstances, the timing of a prediction may contribute to its materiality, making it more likely that a reasonable investor would rely on it in making investment decisions. Although there is scant authority on this point, it seems clear that an inference from timing alone is not sufficient, without additional supporting facts and circumstances, to withstand the strict requirements of Rule 9(b). See Fox v. Equimark Corp., 782 F.Supp. 295, 300 (W.D.Pa.1991) (although reversal of fortune came less than three weeks after release of optimistic annual report, complaint dismissed because "the mere implication of fraud made from the timing of public statements is not enough to meet 9(b)'s particularity requirement for pleading fraud"); In re Healthco Int'l Inc. Sec. Lit., 777 F.Supp. 109, 115 (D. Mass.1991) (complaint dismissed even though proxy statement issued a week after end of fourth quarter failed to disclose company's poor fourth quarter and its impact on possible merger); Steiner v. Shawmut Nat'l Corp., 766 F.Supp. 1236, 1246-47 (D.Conn.1991) ("complaint alleges only in a most sketchy fashion circumstances which would give rise to an inference of fraud" where timing of statements is sole basis for allegation) (quoting Ross v. A.H. Robins, 607 F.2d 545, 558 (2d Cir.1979), cert. denied, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980)); Driscoll v. Landmark Bank for Sav., 758 F.Supp. 48, 52-53 (D.Mass.1991) ("inference one may draw from the timing" of public statements not sufficient under 9(b) even though reported loss in earnings closely followed bank's optimistic statements); Salit v. Centerbank, 767 F.Supp. 429, 431 (D.Conn.1990) (where corporation on November 29 reaffirmed its intention to maintain its dividend, yet two weeks later chief executive officer resigned and less than two months later corporation announced it would add $40 million to loan loss reserves in its fourth quarter and would not pay its fourth quarter dividend, complaint alleging fraud dismissed because it contained "no particulars as to the respect in which ... the statements are fraudulent and presents no basis for [a] belief that the defendants were engaging in fraud").[9]
 
 
 54
 Indeed, timing has only been considered significant in cases in which there were circumstances other than timing that may have justified investor reliance, such as where a company has made specific dollar predictions or a number of very positive predictions, and in which there were allegations of specific evidence, other than timing, demonstrating that those predictions had no factual basis. See, e.g., Goldman v. Belden, 754 F.2d 1059 (2d Cir.1985); Marx v. Computer Sciences Corp., 507 F.2d 485 (9th Cir.1974). Thus, in both Goldman and Marx, on which Hillson heavily relies, there were allegations of specific evidence, other than timing, that those predictions had no factual bases, and in Marx, 507 F.2d at 488, the company projected $105 million in gross revenues and $1 per share in net income, whereas in Goldman, 754 F.2d at 1069, the company was alleged to have made "a series of very positive predictions as to probable success."
 
 
 55
 The two "on track" statements here were neither specific dollar predictions like those in Marx, nor did they constitute a "series of very positive predictions" like those in Goldman. Even more significantly, Hillson's complaint, unlike those in Marx and Goldman, alleges no facts, other than timing, demonstrating that Adage lacked a reasonable basis for its "on track" statements. Hillson now argues that Allister's underperformance, which had been known to Adage for some time, provides such facts, thereby casting doubt on the reliability of the "on track" statements. Of course, such assertions must be alleged in the complaint; they cannot simply be raised in argument. See Fed.R.Civ.P. 9(b). Moreover, the undisputed facts are that, as Adage acknowledged in several previous public filings, Allister had been underperforming for three years prior to the August, 1992 "on track" statements, and that even with that underperformance Adage managed to have two record-breaking quarters in the first half of 1992. Thus, there is no reason why, in the minds of Adage's management in August, 1992, Allister's historical underperformance should have cast any doubt on Adage's ability to continue "on track" for two more record-breaking quarters in the last half of 1992.
 
 
 56
 The final two statements challenged by Hillson were made in November and December of 1992. In Adage's third quarter report, issued on November 13, 1992, Cahill explained in some detail the company's poor third quarter results, including the difficulties with Allister and Fort Orange, and then concluded:
 
 
 57
 With Fort Orange back operating at improved rates, Niagara Cold Drawn and RedGo Properties performing exceptionally well, Relm showing significant improvements over 1990 and 1991 and reduced costs at Allister, we should have an excellent fourth quarter and see significant improvements during 1993.
 
 
 58
 On December 15, two weeks before the end of the fourth quarter, the Wall Street Journal reported that:
 
 
 59
 Adage Inc. expects to have a better fourth quarter and year in sales and overall net income than a year ago, said Robert H. Cahill, president. Calling 1992 a transition year, Mr. Cahill said 1993 would be "a very good year" for Adage.
 
 
 60
 The article further stated that "[t]he executive is looking for 1992 sales of about $100 million and 1993 sales of about $110 million."
 
 
 61
 The experienced trial judge held that these statements were "too vague and indefinite to be anything more than loose non-actionable predictions." The statements are obviously not guarantees. See Malone, 26 F.3d at 479. Nor are they "hard statements of corporate operations and performance for the near term," as Hillson argues. Rather, they are replete with the language of future prediction ("should have an excellent fourth quarter" and "expects to have a better fourth quarter") rather than present fact. A statement is only material when there is a substantial likelihood that a reasonable investor would consider it "significant," Basic, 485 U.S. at 240, 108 S.Ct. at 988, and a "reasonable" investor is not necessarily a "prudent" or "conservative" investor. Texas Gulf Sulphur Co., 401 F.2d at 849. Nevertheless, Hillson claims that these statements, like the August "on track" statements, are expressions of opinion as to current facts that were false and for which Adage lacked any "reasonable basis." As with the "on track" statements, Hillson relies heavily on the timing of the statements. The timing of the December statement, two weeks before the end of the fourth quarter and fiscal year, does give us pause. However, even if we were to hold timing alone--without circumstances involving specific dollar projections or a "series" of very optimistic projections--is sufficient to make these otherwise indefinite statements material (something no court has yet done), Hillson still must state its allegations regarding Adage's assertedly fraudulent misstatements of material fact with particularity.
 
 
 62
 On close examination, it is clear that the November and December statements are, in large part, totally accurate. The only portion of the November report that is purportedly false is: "[w]ith Fort Orange back operating" and other "improvements over 1990 and 1991 and reduced costs at Allister, we should have an excellent fourth quarter...." The allegedly false portion of the December press account is the statement that Adage "expects to have a better fourth quarter and year in sales and overall net income than a year ago." In fact, during the fourth quarter of 1992, the company ultimately reported sales of $25 million, an increase over 1991 fourth quarter sales of $18 million and over 1992 third quarter sales of $24 million, and income of $231,000, a decrease of $97,000 over that reported during the fourth quarter of 1991 but an increase of $384,000, or more than 250%, over the 1992 third quarter loss of $153,000. For the year the company reported sales of $97 million against $75 million in sales in 1991, and net income of $1,089,000, a 75% increase over its 1991 net income of $622,000. Thus, fourth quarter net income exceeded that of the third quarter; fourth quarter sales, annual sales, and annual net income exceeded that of 1991; and 1992 sales were "about $100 million." Accordingly, with regard to most indicia, Adage's 1992 fourth quarter was indeed "excellent," as predicted in the November statement, and the year was indisputably "better ... in sales and overall income than a year ago," as predicted in the December statement; furthermore, 1992 sales were "about $100 million," as also predicted in the December statement.
 
 
 63
 The November and December statements are thus inaccurate only to the extent they predicted 1992 fourth quarter income would surpass that realized in the fourth quarter of the previous year. The November statement does not specify whether the hoped for "excellent fourth quarter" is to be evaluated by comparing the fourth quarter's results to those of the quarter immediately preceding it or to the fourth quarter of the previous year. Nor does the complaint allege that there is any invariable rule in this regard. See Capri Optics Profit Sharing v. Digital Equipment Corp., 950 F.2d 5, 10 (1st Cir.1991) (stockholder asserts correct comparison is with immediately preceding quarter and not with comparable quarter of previous year). It is similarly unclear whether "better fourth quarter" in the December statement means "better" than the third quarter or "better" than the fourth quarter of the previous year. Although the Wall Street Journal column headline, which does not purport to quote Cahill, states that "Adage Expects Quarter and Year to Improve Upon 1991 Results," the article itself can certainly be read as stating only that fourth quarter sales "and overall net income" for the year were expected to be better than the previous year, which they were.[10]
 
 
 64
 Even if the November and December statements are read as predictions that income in the fourth quarter of 1992 would surpass that in the fourth quarter of 1991, they are not actionable because Hillson fails to allege facts showing that the company did not believe these predictions were "accurate at the time [they were made]." Raab, 4 F.3d at 290. Rather, Hillson's sole allegation on this point is that "the Company made material misrepresentations in the November 13 and December 15 statements concerning 1992 fourth quarter earnings in the face of directly contrary information, known only to it, that 1992 fourth quarter net income and earnings per share would represent but a fraction of those levels for the same period in 1991." The complaint alleges no facts indicating that Adage or its representatives knew in advance about its disappointing fourth quarter results. See In re Healthco, 777 F.Supp. at 115 n. 9 (plaintiffs averred no facts as to how defendants' accounting system would or should have made them aware of any concrete financial figures for the fourth quarter before February 25, 1991, when Healthco announced its expected losses for the fourth quarter). Nor does it allege what other "directly contrary information" was available at the time. Thus the complaint utterly fails to allege facts indicating Adage lacked a reasonable basis for its November and December predictions. See Greenstone, 975 F.2d at 25-26 (dismissing complaint that alleged negative event should have been anticipated in an earlier disclosure because a "general averment" that from negative event or poor performance one can infer earlier knowledge of that event or poor performance "without more, will not do") (Breyer, J.).
 
 
 65
 In its memorandum in the district court and again on appeal, Hillson argues, as it did with regard to the August "on track" statements, that the "critical problems at Allister" provide such facts and hence constitute such "directly contrary information known only" to Adage. However, as explained above, argument is no substitute for allegations in the complaint and, furthermore, it is undisputed that (as Adage acknowledged in public filings in March, 1992) Allister had been underperforming for years prior to the November and December statements, losing almost $1.5 million in 1991, yet Adage's first two quarters of 1992 were nevertheless record-breaking. Accordingly, there is no reason why Allister's "critical problems" would necessarily have made Adage management aware, even in November and December, that the results of the fourth quarter of 1992 would not exceed that of the fourth quarter of 1991.
 
 
 66
 Moreover, it is simply not true that Allister's problems were "known only to" Adage at the time of the November and December statements.[11] Although there is no discussion of Allister in the short Wall Street Journal article that appeared in December, by that time Adage itself had publicly disclosed Allister's problems on at least four separate occasions in 1992. In addition to the company's 1991 annual report and Form 10K, filed in March of 1992, Adage detailed Allister's problems in the November 4 press release, which focused exclusively on Allister, and in the November 13 report itself, which further explained:
 
 
 67
 Allister has been underperforming for more than two years. The third quarter witnessed additional erosion of margins and we realized that our investment in a higher level of sales activity was not producing the planned results. Consequently, on 30 October 1992 I effected a major management change removing nine recently appointed senior and middle management personnel and installed myself as President of the subsidiary. The management team that is now at the helm has been with Allister for a number of years.
 
 
 68
 Many of you may know that I was President of Allister from 1980 through 1988. As a result, I am very familiar with the operation and markets it serves.
 
 
 69
 The management change will produce annual savings of $825,000. The task ahead is to regain the confidence of our customers, improve margins and continually reduce costs. I will do my best. Allister's former facilities in Tennessee have been sold and we will achieve additional savings by the elimination of taxes, interest and depreciation. We also expect a significant improvement in quality in the products produced by Relm.
 
 
 70
 There are two other considerations that lead us to conclude that the November and December statements were not materially misleading. The first is that they contained cautionary language. In the November report Adage not only discussed Allister's problems and the Fort Orange delays in detail,[12] but in that same report the company also disclosed its poor third quarter results and repeatedly mentioned its hope for "improvement." Similarly, in his brief December statement Cahill was reportedly expecting "improvement" and "[c]alling 1992 a transition year" in comparison to 1993, which would be "a very good year" for Adage. It is well recognized that statements that include such cautionary language are usually "not the stuff of which securities fraud claims are made." Romani v. Shearson Lehman Hutton, 929 F.2d 875, 879 (1st Cir.1991) (quoting Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir.1986)); see also In re Donald J. Trump Casino Sec. Lit., 7 F.3d 357, 364 (3d Cir.1993) (recognizing "well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law"). Compare Goldman, 754 F.2d at 1068 (absence of any "note of caution" supports conclusion that statements were actionable).
 
 
 71
 Finally, materiality depends "upon an evaluation of the magnitude of the event, discounted by the improbability of occurrence," 2 Thomas Lee Hazen, Treatise on the Law of Securities Regulation Sec. 13-5 at 90-91 (2d ed.1990), and the magnitude of the event is measured "in light of the totality of the company activity." Basic, 485 U.S. at 238, 108 S.Ct. at 987. Adage's 1992 fourth quarter net income was $231,000 ($97,000 less than the previous fourth quarter) on revenues of $25 million. Even if the November and December statements are read as predictions that the company would surpass the net income achieved in the fourth quarter of the previous year, the difference between the company's predicted income (approximately 1.4% of revenues, or $330,000) and its delivered income (only .9% of revenues, or $231,000) was only .5% of total revenues. This difference is hardly material.
 
 IV.
 
 72
 In the alternative, Hillson contends that Adage had a duty to update or correct its quarterly reports and press releases, even if they were accurate when made, as soon as it became apparent that the assertions or predictions in them were inaccurate. "In order for there to be liability under 10b-5 for omissions or nondisclosure, however, a duty to speak must exist." Walker v. Action Indus., 802 F.2d 703, 706 (4th Cir.1986), cert. denied, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1000 (1987). "Silence, absent a duty to disclose, is not misleading." Basic, 485 U.S. at 238 n. 17, 108 S.Ct. at 987-88 n. 17. Assuming that there can ever be a "duty to update," there was no such duty here.
 
 
 73
 The statements at issue here were predictions, neither material under the federal securities laws nor pled with sufficient particularity to allege a claim for fraud. There is no duty to update such statements on the basis of subsequent events. See In re Time Warner Inc. Sec. Litigation, 9 F.3d 259, 267 (2d Cir.1993) (statements "lack the sort of definite positive projections that might require later correction [and] suggest only the hope of any company, embarking on [strategic alliance] talks with multiple partners, that the talks would go well").[13] Liability under Sec. 10(b) and Rule 10b-5 stems from an omission or misrepresentation of material fact upon which a reasonable investor might have relied; where there has been no such omission or misrepresentation, there can be no further obligation to update because, almost by definition, such disclosure would not significantly alter the total mix of available information. To require Adage continually to correct and modify its projections would inevitably discourage the types of disclosure the securities laws seek to encourage. See Raab, 4 F.3d at 290. As we explained in Walker, in determining whether a corporation need ever disclose economic projections:
 
 
 74
 Because of the frequency and volatility of these projections, the imposition of a duty to disclose them would have required virtually constant statements by [the issuer] in order not to mislead investors. Under these circumstances, we deem the projection disclosures urged by [appellant] to be impractical, if not unreasonable.
 
 
 75
 Walker, 802 F.2d at 710.
 
 V.
 
 76
 We have carefully considered each of Hillson's arguments and, after applying the controlling legal principles, rejected each. At first blush, those principles may seem, as a matter of policy, to require too much of a plaintiff in a securities case. On reflection, however, we believe that they strike an entirely appropriate balance. Plaintiffs who can allege they have been injured by reliance on fraudulent misstatements or omissions of material current facts can state a cause of action. Those, like Hillson, who can only allege injury from purported reliance on future projections that did not prove accurate and so for this reason assertedly must be fraudulent, cannot. These are, to be sure, rigorous requirements that do, and will continue to, eliminate many claims at a preliminary stage. This seems justified, however, because "in this type of litigation ... the mere existence of an unresolved lawsuit has settlement value to the plaintiff not only because of the possibility that he may prevail on the merits, an entirely legitimate component of settlement value, but [also] because of the threat of extensive discovery and disruption of normal business practices...." Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 742-43, 95 S.Ct. 1917, 1928-29, 44 L.Ed.2d 539 (1975). As we noted in Raab, imposing liability on companies for predictions of future growth, which are often and inevitably wrong, would lead to the further proliferation of lawsuits[14] and would be contrary to the "goal of full disclosure underlying the securities laws." Raab, 4 F.3d at 290. Accordingly, we are satisfied that the result reached here is a correct application of both the law and appropriate public policy.
 
 
 77
 AFFIRMED.
 
 
 
 [1]
 Section 10(b) provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange--
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 15 U.S.C. Sec. 78j.
 
 
 [2]
 Rule 10b-5 provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 
 
 [17]
 C.F.R. Sec. 240.10b-5 (1992)
 
 
 [3]
 Although the existence of the Contingent Share Agreement is ultimately not relevant to our decision here, we note that the per share price of Adage's common stock never--at anytime--approached the levels contemplated by the Contingent Share Agreement ($9 per share for ninety days) during the purported class period
 
 
 [4]
 In an unpublished opinion we affirmed dismissal "on the reasoning of the district court." 27 F.3d 562 (4th Cir.1994)
 
 
 [5]
 Indeed, in Raab v. General Physics Corp., 4 F.3d 286, 289 n. 1 (4th Cir.1993), we expressly so stated, noting that in Cooke we "had no reason to address: (i) whether the complaint satisfied Rule 9(b)'s pleading requirements; (ii) whether soft puffing statements are actionable in themselves; or (iii) whether a company can be liable for third party opinions and statements." Examination of the materiality or misleading nature of the statements was, of course, unnecessary to our holding in Cooke because, although an "appellate court has the power to determine independently whether summary judgment may be upheld on an alternative ground where the basis chosen by the district court is erroneous," it need not do so. See Ross v. Communications Satellite Corp., 759 F.2d 355, 363 (4th Cir.1985), rev'd sub nom. on other grounds, Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); see also Charbonnages de France v. Smith, 597 F.2d 406, 416 n. 9 (4th Cir.1979) (appellate court can affirm grant of summary judgment "at least [on] any alternative grounds that had been presented both to the district court and on appeal so that the nonmoving party has had fair opportunity to contest them at both levels"); Paskaly v. Seale, 506 F.2d 1209, 1211 n. 4 (9th Cir.1974) (appellate court can affirm grant of summary judgment "on any ground supported by the record, provided the parties have had the opportunity to discuss it in their briefs" in the appellate court). There was no discussion in the appellate briefs in Cooke of whether the statements there were material or misleading
 
 
 [6]
 Although the losses reported by Adage in its 1991 annual report and 10K were not attributed to Allister per se, operating losses of $1.567 million, $1.051 million, and $25,000 for 1991, 1990, and 1989, respectively, were attributed to Adage's "specialty manufacturing" industry segment, and Allister was clearly denominated as Adage's "specialty manufacturing group" in Adage's reports
 
 
 [7]
 Hillson's attempt to distinguish Raab, Wielgos, and Borow is unpersuasive. Although a "private construction project" was involved here, it is common knowledge and certainly known to reasonable investors that such projects, like development of new products, are invariably subject to unanticipated delays
 
 
 [8]
 The district court dismissed Hillson's complaint as to the "on schedule" statement for failure to allege any damages suffered as a result of this statement, because the price paid for Adage stock actually increased within 34 days after disclosure of the delays surrounding the installation of the Fort Orange paper machine. We do not base our holding on this fact but do take note of it, as additional evidence of the lack of materiality of the "on schedule" statement
 
 
 [9]
 We recognize that in most of these cases the complaint was dismissed with leave for the plaintiffs to amend to state their claims with the required particularity. These cases are nonetheless relevant because Hillson has never suggested to either the district court or this Court that it wished to, or could, amend its complaint to allege its claims with more specificity. Rather, Hillson's consistent argument throughout has been that in its present complaint it has "sufficiently alleged" a factual basis for virtually all of its claims. The only factual allegation that it seeks to add to the complaint (and it only seeks to amend if the absence of this fact "is a material fault in the pleadings") is the allegation that the Wall Street Journal article was based on an interview with Cahill; that fact is, of course, irrelevant to our decision here
 
 
 [10]
 It is not at all clear that "indirect quotes taken from a newspaper reporter's notebook" satisfy the strictures of Rule 9(b), Ferber v. Travelers Corp., 785 F.Supp. 1101, 1108 (D.Conn.1991), or that liability with respect to statements made in a newspaper article is appropriate when a defendant lacks control over the article. See Raab, 4 F.3d at 288; Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163 (2d Cir.1980) (no liability absent allegations that company "sufficiently entangled itself with the analysts' forecasts to render those predictions 'attributable to it' "). Adage argues that it lacked control over the contents of the December Wall Street Journal article and so cannot be held responsible for its contents. Hillson counters that the article was derived from an interview with Cahill, and so Adage should be held responsible for these statements. We need not resolve this issue here but do note that Hillson does not attempt to rely on the headline of the article, at least implicitly conceding that Adage had no control over the headline
 
 
 [11]
 For this reason, Hillson's alternative argument that Adage omitted these allegedly material facts from its November and December statements is meritless. See Sailors, 4 F.3d at 613; Raab, 4 F.3d at 289
 
 
 [12]
 In its reply brief, Hillson claims for the first time that the "protracted delays at Fort Orange and the combined negative impact" of those delays, together with Allister's problems, also constituted "directly contrary information known only" to Adage, which would indicate that Adage lacked a reasonable basis for its November and December predictions. Since these arguments were never made below, they are not properly before us now. See Fowler v. Land Management Groupe, Inc., 978 F.2d 158, 164 (4th Cir.1992); see also Fed.R.Civ.P. 9(b) ("circumstances constituting fraud or mistake shall be stated with particularity ... in all averments of fraud or mistake") (emphasis added). Moreover, the Fort Orange delays were described in the November 13 report in almost as much detail as the problems at Allister. Thus, like the problems at Allister, the delays at Fort Orange and the cumulative impact of both the delays and Allister's problems were hardly information "known only" to Adage
 
 
 [13]
 Dicta in some cases can be read to suggest a possible duty to update even immaterial statements in that those cases do not expressly limit the asserted duty to update to statements that are material. See, e.g., Backman v. Polaroid Corp., 910 F.2d 10, 16-17 (1st Cir.1990); In re Phillips Petroleum Sec. Lit., 881 F.2d 1236, 1245 (3d Cir.1989). Although Hillson generally relies on these cases, it does not claim that a company has a duty to update immaterial statements. Rather, its claim is that "a company has an affirmative duty to publish updated information where its prior material statement ... has become materially misleading in light of subsequent events" (emphasis added). Accordingly, we need not here reach the question of whether there can be a duty to update an immaterial statement
 
 
 [14]
 Recently it was reported that in 1989 cash settlements in securities class-action suits totaled an estimated $529 million; by 1992, settlements had jumped nearly three fold to $1.55 billion. Bruce Rubenstein, "Cease and Desist," Corp. Legal Times, Sept. 1, 1994, at 1