**Leonard PITTEN, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**Henry D. JACOBS, Jr. and One Price Clothing Stores, Inc., Defendants.**

**Kathrine HOGAN, on behalf of herself and all others similarly situated, Plaintiff,**

v.

**Henry D. JACOBS, Jr. and One Price Clothing Stores, Inc., Defendants.**

Civ. A. Nos. 3:94–2544–0, 3:94–2545–0.

United States District Court,
D. South Carolina,
Columbia Division.

July 6, 1995.

Ness, Motley, Loadholt, Richardson & Poole, Terry E. Richardson, Jr., Kimberly S. Vroon, Barnwell, SC, Kaplan, Kilsheimer & Fox, Frederic S. Fox, Laurence D. King, New York City, Law Offices of Richard Vita, Richard Vita, Boston, MA, Berman, DeValerio & Pease, Peter A. Pease, Michael G. Lange, Boston, MA, for Plaintiffs Leonard Pitten and Kathrine Hogan.

Wyche, Burgess, Freeman & Parham, P.A., David L. Freeman, J. Theodore Gentry, Greenville, SC, Skadden, Arps, Slate, Meagher & Flom, Jay B. Kasner, New York City, for Defendants One Price Clothing Stores, Inc. and Henry Jacobs.

## OPINION AND ORDER

PERRY, District Judge.

The plaintiffs in this action seek to represent a subset of the owners of the common stock of One Price Clothing Stores, Inc. ("One Price").[1] The plaintiffs seek recovery from One Price and its Chairman and CEO, Henry Jacobs, on the basis of two statements that plaintiffs claim were false and misleading. The plaintiffs' Complaint[2] asserts both federal securities law and state common law causes of action. The action is before me on the defendants' motion to dismiss the Complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. For the reasons that follow, the motion is granted.

### I.

### FACTUAL BACKGROUND[3]

Defendant One Price operates a chain of off-price retail apparel stores offering women's and children's garments and accessories. As its name suggests, one Price offers all goods for sale in its stores at a uniform price—$7.00. One Price achieves this low

---

1. The action was commenced by the filing on the same day of two virtually identical Complaints, which varied only in the identity and characteristics of the named plaintiffs. The parties have agreed to consolidation of these two actions.

2. Absent express reference to the original Complaints filed in this action, all references to plaintiffs' "Complaint" in this opinion are to the "First Amended Class Action Complaint" which was filed on behalf of all the named plaintiffs approximately five months after the filing of the original Complaints.

3. This background summary is drawn from the plaintiffs' Amended Complaint, the well-pleaded factual allegations of which are, solely for purposes of this motion, accepted as true. See *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

price by purchasing merchandise at substantial discounts. It is able to obtain these discounts by its willingness to purchase discontinued goods, overruns, canceled orders, odd lots, and its readiness to buy later in the season than most retailers.

One Price is headquartered in Duncan, South Carolina. It began operations in 1984 and, as of July 2, 1994, it operated 586 stores in 28 states. Defendant Henry Jacobs is one Price's President and Chief Executive officer.

One Price uses the calendar year as its fiscal year. It appears that the first two quarters of 1994 were quite satisfactory for One Price. The trouble, according to the Complaint, began in the third quarter of 1994.

The gist of plaintiffs' claim is that One Price knew or should have known that the third quarter troubles were coming, and that the defendants made statements that were false and misleading because they failed to warn that third quarter performance might not be as strong as had once been thought. The result, according to plaintiffs, is that One Price's stock was artificially inflated for a brief period of time between the making of those statements and a press release issued by One Price indicating its lowered expectations for the third quarter.

In support of this theory, the Complaint identifies two statements made during the third quarter, which plaintiffs attribute to defendants and which plaintiffs say were false and misleading:

1. *The "Normal Sales" Statement.* On or about August 11, 1994, One Price filed its form 10–Q for the quarter ended July 2, 1994 with the Securities and Exchange Commission. Referring to One Price's third quarter (July through September), the 10–Q stated that "[s]ales thus far in the third quarter of 1994 remain at normal levels."

2. *The "Comfort" Statement.* On August 24, 1994, the *Dow Jones Newswire* ran a report of an interview with defendant Jacobs. The report attributes to Jacobs a statement that One Price was "comfortable with analysts' earnings estimates of 5 cents to 7 cents a share for the third quarter, compared with 6 cents a year ago." The report goes on to state that Jacobs "said he was also comfortable with estimates that the Company will earn from $1.05 to $1.10 a share in 1994, compared with 84 cents a year ago."

To support their contention that these two statements were knowingly false when made, plaintiffs plead six additional allegations:[4] (a) that average per store inventory at the end of the second quarter was up 9% over the comparable period for the previous year; (b) that excessive amounts of warm weather merchandise had been purchased and shipped late in the season; (c) that the store or stores in Puerto Rico had excessive inventory; (d) that an ongoing change in One Price's distribution center from hanging pack (shipment of garments on hangers) to flatpack (shipment of folded garments in boxes) was disrupting One Price's ability to restock stores; (e) that these distribution problems "would necessarily have an adverse impact on sales"; and (f) that One Price had a sophisticated management information system that gave it "intimate and immediate knowledge of sales and inventory levels."

The Complaint defines the class period to begin on August 11, 1994, coinciding with the Normal Sales statement, the first of the two allegedly misleading statements. The alleged class period ends five weeks later, on September 16, 1994. The significance of September 16 is that it was the last trading day preceding One Price's September 19 issuance of a press release in which One Price announced that it anticipated a loss of $0.14 to $0.18 per share, instead of the gain of $0.05 to $0.07 per share mentioned in the *Dow Jones Newswire article.*

According to the Complaint, one Price's common stock closed at a price of $14.25 per share on September 16. On September 19, the share price fell to $9.75 per share.

The two original Complaints in this action were filed three days later, on September 22, 1994. Like the Amended Complaint, those Complaints sought recovery on behalf of shareholders who purchased One Price stock

---

**4.** These items are the most significant difference between the original Complaints and First

Amended Class Action Complaint.

during the alleged class period—that is, after one or both of the Normal Sales statement and the Comfort statement, but before the September 19 press release.

## II.

### DISCUSSION

#### A. Plaintiffs' Federal Securities Law Claims

Plaintiffs' primary claim for federal relief arises under Rule 10b–5, promulgated by the SEC under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). Rule 10b–5 provides as follows:

> It shall be unlawful for any person ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.... in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

■■■ The Fourth Circuit has identified the elements that a plaintiff must establish to maintain a 10b–5 action: (1) the defendant made a false or misleading statement of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages. *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 208 (4th Cir.1994); *Malone v. Microdyne Corp.*, 26 F.3d 471, 476 (4th Cir.1994). The elements of a 10b–5 action sound in fraud, and must therefore be pled with the particularity required by Federal Rule of Civil Procedure 9(b). *See Breckley v. Amway Corp.*, Fed.Sec.L.Rep. 94,736 at 93,-969, 1989 WL 140397 (D.S.C. Aug. 24, 1989).

In resisting plaintiffs' claims, defendants argue first that the Normal Sales and Comfort statements are not material, and thus not actionable. In the alternative, defen-

dants argue that plaintiffs have failed to plead their claims with the particularity required by Rule 9(b). I turn first to the issue of materiality.

#### 1. Dismissal Pursuant to Rule 12(b)(6)

##### a. The Comfort Statement

■■ A newswire report dated August 24 attributed to Henry Jacobs a statement that One Price was "comfortable with" analysts' earnings estimates for One Price for the third quarter of 1994 and for the entire year. The statement was reported with five and one-half weeks remaining in the quarter and more than four months left in the year.[5]

Defendants argue that the Fourth Circuit's recent decisions in *Malone and in Raab v. General Physics Corp.*, 4 F.3d 286 (4th Cir. 1993) foreclose a cause of action based on the Comfort statement. In Malone, one of the statements alleged by the plaintiffs to have been false or misleading was a statement made by the Chairman and President of the defendant in response to an inquiry from a Dow Jones reporter.[6] In the statement, made midway through the second quarter of fiscal 1992, the Chairman said that he was "comfortable with the earnings estimates for fiscal 1992 and 1993 that had been prepared by an institutional analyst." 26 F.3d at 473.

The Fourth Circuit held that the statement of comfort with earnings estimates would not support recovery. The court noted first that the statement of comfort was "purely a projection of ... future performance." It then stated the rule in the Fourth Circuit that projections of future performance "will be deemed actionable under § 10(b) and Rule 10b–5 only if they are supported by specific statements of fact or are worded as guarantees." 26 F.3d at 479.

The comfort statement in *Malone* "obviously did not constitute a guarantee and was certainly not specific enough to perpetrate a

---

5. One interesting issue presented by the Comfort Statement is whether a 10b–5 action can be predicated on a statement in the press when the defendant did not control the statement. The reporter may misunderstand, misquote, or simply omit important qualifying statements that the defendant made. *See Hillson*, 42 F.3d at 217 n. 10. Because I conclude that the Comfort State-

ment is not material as a matter of law, I need not reach this issue.

6. *Malone* involved six other allegedly false or misleading statements, none of which is relevant to the issues here.

fraud on the market." 26 F.3d at 480. Thus, the Malone court concluded, the comfort statement "is not actionable as a matter of law." 26 F.3d at 480.

The decision in Malone rested in large part on the analysis in *Raab*. In that case, the Fourth Circuit set out to "address the impact of the securities laws on a company's predictions of its future business prospects." 4 F.3d at 287. In its discussion, the Fourth Circuit zeroed in on the dilemma faced by any company that chooses to make predictions as to future performance:

> Predictions of future growth ... will almost always prove to be wrong in hindsight.... If growth proves less than predicted, buyers will sue; if growth proves greater, sellers will sue. Imposing liability would put companies in a whipsaw, with a lawsuit almost a certainty. Such liability would deter companies from discussing their prospects, and the securities markets would be deprived of the information those predictions offer. We believe that this is contrary to the goal of full disclosure underlying the securities laws, and we decline to endorse it.

4 F.3d at 290. Thus, the Fourth Circuit's rule—that projections of future performance not worded as guarantees are generally not actionable because they are not material—is necessary in order give companies the freedom to provide projections to the market. See *id.*

In *Raab*, as in *Malone*, the court applied this principle to a statement very similar to the Comfort statement in the instant case. At issue in *Raab* was a statement in a press release, issued at the end of the first quarter, that conditions in the first quarter were temporary and "that results during the remainder of the [year] should be in line with analysts' current projections." 4 F.3d at 288.

In fact, the court noted, this prediction proved incorrect, and results were not in line with the analysts' estimates, "but hindsight does not establish fraud.... The market has risks; the securities laws do not serve as investment insurance." The court concluded that the statement that results " 'should be in line with analysts' current projections' hardly constitutes a guarantee that earnings would be forthcoming in particular amounts; this forecast, like the others, lacks the specificity necessary to make it material." 4 F.3d at 291. Accordingly, the Fourth Circuit affirmed the dismissal by the district court.

Defendants assert that the Fourth Circuit's recent "trilogy" of securities law decisions—*Raab, Malone, and Hillson*[7]—establish that courts can resolve the materiality issue as a matter of law. Defendants further argue that there are no distinctions between the instant case and *Raab* or, more particularly, *Malone,* and accordingly that the Comfort statement must be held not to be actionable as a matter of law. Plaintiffs, at oral argument and in their briefs, struggle to distinguish these governing precedents. They offer several potential distinctions, none of which overcomes the fact that the circumstance here and in *Malone* are all but identical.

First, plaintiffs suggest that *Raab* did not involve "the kind of specific dollar projection involved here." Plaintiffs do not make this argument with respect to *Malone,* a tacit recognition that this distinction,, if it is one,[8] is not present in *Malone. Malone* involves a specific analyst's projection-earnings of $0.80 per share for 1992 and $1.05 for 1993, 26 F.3d at 473—but nevertheless holds that an expression of comfort with the projection is not actionable.

Plaintiffs' next proffered distinction is that *Malone* involved projections extending farther into the future than the projections at issue here. The short answer to this argument is that the Fourth Circuit has squarely rejected it, holding that "[t]here is nothing in *Raab* (or *Malone*) that suggests a prediction

---

7. The Fourth Circuit has recently added to this trilogy a fourth opinion affirming a district court's dismissal of a securities law claim as a matter of law. *Herman v. Legent Corp.,* 1995 WL 115879, 50 F.3d 6 (4th Cir. Mar. 20, 1995) (unpublished op.; affirming *Bentley v. Legent Corp.,* 849 F.Supp. 429 (E.D.Va.1994)).

8. It is not clear that *Raab* did not also involve a precise projection; the opinion does not quote the projection. This omission does not allow an inference regarding the precision of that projection.

of future growth ceases to be a prediction of future growth simply because it is made six weeks rather than six months in advance." *Hillson*, 42 F.3d at 214. Although noting that "the timing of a prediction may contribute to its materiality, making it more likely that a reasonable investor would rely on it," the *Hillson* court found it "clear that an inference from timing alone is not sufficient" to render a statement actionable. 42 F.3d at 214–15.

Even if the timing alone of a prediction could be enough in certain circumstances, those circumstances are not present here. *Malone* involved a statement of comfort with an analyst's estimates for two periods—the then-current fiscal year, at that time approximately half over, and the fiscal year to follow. This case, similarly, involves a statement of comfort with estimates for the third quarter, made with just over one-half of that period gone, and for the year as a whole. Each case involves a statement made roughly halfway into the immediate period in question, along with a longer ranging statement. This is not a case in which the "prediction" is made so far into the period that it becomes, in effect, a statement of past or present results instead of a true prediction.

To be sure, the period of time at issue here (a quarter) is shorter than the fiscal year involved in *Malone*, but the rationale for treating predictions as not actionable, absent specific guarantees, remains the same. Predictions are always subject to subsequent events that may undermine what had gone before. *Raab*, 4 F.3d at 290. In fact, short term predictions may be even more vulnerable to this problem, given that a relatively small event may have an impact on results for a month or a quarter, while in the longer term it may be canceled out by other factors.[9] Plaintiffs' proposed distinction, based on the length of the time periods at issue, makes no difference.

Finally, plaintiffs suggested at oral argument that *Malone* and *Raab* do not really stand for the proposition that a statement of "comfort" with analysts' estimates is not ma-

terial as a matter of law. Plaintiffs contend that One Price and Henry Jacobs knew certain facts that made the Comfort statement materially misleading when it was made.

As I will set forth in greater detail hereinafter in the discussion of Rule 9(b), plaintiffs' Complaint fails to plead that these facts were known to the defendants at the time of the Comfort statement. On that ground alone, plaintiffs' suggested distinction fails.

In *Malone*, the district court, after trial, granted judgment as a matter of law to the defendants. The plaintiffs sought recovery on the basis of seven allegedly false or misleading statements. Six of these statements were "report[s] of past or present results," 26 F.3d at 479, dealing with the company's sales and revenues, 26 F.3d at 476. The seventh, the "comfort" statement, "was purely a projection of ... future performance." 26 F.3d at 479.

The Fourth Circuit reversed the judgment for the defendants with respect to the six statements of current results. Evidence was presented at trial that the defendant company had been forced to offer an extremely liberal return policy in order to sell the goods in question. The company booked and reported sales made subject to this policy without making a reserve for or disclosing the existence of the policy. This violated generally accepted accounting practices and rendered the sales figures potentially misleading in that the failure to disclose the return policy hid the potential (which later became reality) for a large number of returns. 26 F.3d at 477–79. In light of this testimony, the Fourth Circuit held that there was a triable issue as to whether or not the six statements dealing with sales and revenues were false or misleading statements of material fact. 26 F.3d at 478.

The *Malone* court distinguished the comfort statement, however, on the ground that it "was purely a projection of ... future performance." 26 F.3d at 479. The court's reasoning did not turn on the presence or absence of evidence that could give rise to an

---

9. Similarly, a longer term projection could be seen as having greater materiality because it purports to tell the investor more about the over-

all prospects of the company. The short term is, by definition, here today and gone tomorrow.

inference that the statement was knowingly false or misleading—even though that is the analysis that was conducted with respect to the other six statements. Instead, the court focused solely on the language of the comfort statement. Finding that it "obviously did not constitute a guarantee and was certainly not specific enough to perpetrate a fraud on the market," the court concluded that "the February 12 'comfort' statement is not actionable as a matter of law." 26 F.3d at 479–80.

This holding is clear in what it says and it governs here. A purely predictive statement of comfort with analysts' projections lacks the materiality necessary to support a 10b–5 action. See *Hillson*, 42 F.3d at 211–12 (analyzing *Malone* and treating the ruling on the comfort statement there as a matter of law, based on its predictive nature). I conclude that the claim based on the Comfort Statement is defective as a matter of law.

### b. The Normal Sales Statement

■ One Price's third quarter 10–Q contains the statement that "[s]ales thus far in the third quarter of 1994 remain at normal levels." Defendants argue that this Normal Sales statement is, as a matter of law, too vague and general to support a securities fraud action. Defendants point out that the Fourth Circuit has recently explained that a matter is "material" only if there is "a substantial likelihood that the ... fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Hillson Partners*, 42 F.3d at 209 (*quoting Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). Statements that do not contain material fact, but consist instead of soft, vague, or general assertions, cannot support a 10b–5 action. *See Raab*, 4 F.3d at 289.

Defendants point to two elements of the Normal Sales statement in arguing that it is not the type of statement that would be "viewed by the reasonable investor as having significantly altered the 'total mix' of information" available. First, they contend that the "thus far" qualifier in the statement makes it clear that the statement addresses the third quarter as a whole, and that the

reader is thus put on notice that the statement is necessarily preliminary, tentative, and predictive. Results for the quarter as a whole could still vary. Second, defendants contend that the word "normal" itself is too vague to allow reasonable reliance by an investor.

Plaintiffs' position on the meaning of the Normal Sales statement appears to the Court to bolster the argument of defendants that the statement is too vague and general to support a fraud action, for plaintiffs contend that the statement is *both* a statement of current fact and a prediction of future performance. Regarding the Normal Sales statement, plaintiffs' counsel stated at oral argument:

> One thing I would point out about that statement, that is a statement of fact as of that date in time which we claim was a misrepresentation. We also claim that it was misleading because the defendants knew a number of things on that date which made it misleading for them to make a statement about sales with the necessary implication that they are on track for the quarter and they are going to have ... earnings to report which are in line with their normal practice.

Transcript at 32. The suggestion by plaintiffs that the statement has two meanings is at odds with their claim that the statement has the kind of concreteness and clarity necessary for it to be deemed material. While it is not logically impossible for a single statement to carry two meanings, fraud plaintiffs, may not point out a vague or ambiguous statement, catalogue all its potential meanings and implications, and then select the one most favorable to their cause. Before a statement can be deemed misleading, it must be clear where the statement leads.

Quite apart from this general vagueness, however, the Normal Sales statement will not support plaintiffs' claim. On the one hand, if one treats the statement solely as one of existing fact—that on or about August 11, 1994, one Price's third quarter sales were "normal" (putting to one side the question of

what "normal" means [10])—then plaintiffs have failed to make any allegation that sales at that time were anything other than "normal." As I discuss further in the treatment of Rule 9(b) *infra*, this means that the claim, so understood, cannot proceed.

It may be for this reason—the inability to say that sales were "abnormal" on August 11—that plaintiffs in their Amended Complaint shift the focus of their efforts by attempting to turn the Normal Sales statement into a broad pronouncement on sales and earnings for the third quarter as a whole. In their Amended Complaint, plaintiffs assert that the Normal Sales statement "was intended to and did give the impression that the quarter's earnings would be in line with those of previous years." Complaint ¶ 31. In their memorandum in opposition to the motion to dismiss,[11] plaintiffs characterize the Normal Sales statement as "concerning both [One Price's] sales through that date and the likely results for the quarter." Pl. Mem. at 19.

■ This argument does not help plaintiffs. It takes the case instead precisely where defendants would have it go—to the Fourth Circuit cases ruling on the materiality of predictions of future performance. As set forth above, the law in the Fourth Circuit is clear that projections of future performance "will be deemed actionable under § 10(b) and Rule 10b–5 only if they are supported by specific statements of fact or are worded as guarantees." *Malone*, 26 F.3d at 479. And since the statement that "[s]ales

thus far in the third quarter of 1994 remain at normal levels" contains neither specific facts nor guarantees, it is not actionable.

Here again, the recent Fourth Circuit jurisprudence is directly on point. In *Hillson*, the plaintiff complained of a number of statements, including these: (i) a May 19, 1992 press release in which the company's president and CEO was quoted as saying that the company "is on target toward achieving the most profitable year in its history"; (ii) the company's second quarter 10–Q, released August 11, 1992, which stated that the company was "on track to exceed 1990, our record year for net income"; and (iii) a press release of the same date stating that record first half results kept the company "on track toward reaching its previously forecast goal of record full year profits."

The Fourth Circuit affirmed the district court's dismissal for failure to state a claim upon which relief could be granted. It noted that the May "on target" statement was "the type of vague prediction[ ] of growth that we held in *Raab* and *Malone* not to be material as a matter of law." 42 F.3d at 212.

The court reached the same conclusion as to the August "on track" statements. "To the extent that the 'on target' statements were addressed to the third and fourth quarters"—as plaintiffs in this case characterize the Normal Sales statement—"they were not expressions of belief as to current facts, but rather expressions of belief as to uncertain future performance, the very sort of state-

---

10. Defendants argue that the phrase "normal levels" is too vague to support a fraud action, even if the statement is viewed purely as one of current fact. In light of plaintiffs' failure to allege facts showing that sales were not "normal," I do not reach this issue.

11. This memorandum is worthy of mention as the focus of a relatively significant peripheral issue in this case. After the filing of defendants' motion to dismiss, plaintiffs did not file any timely opposition going to the merits of the motion to dismiss within the time provided for by Local Rule 12.06. Instead, after the time for opposition allowed by the rule, plaintiffs filed an "Opposition to Defendants' Motion to Dismiss" which stated plaintiffs intent to rely on their right to amend their Complaint and asserted that this future amendment would constitute their response to the motion to dismiss. Defendants

suggested in their brief that plaintiffs, failure either to file an opposition to the motion or to amend the Complaint within the fifteen days allowed by Rule 12.06 meant, in the language of the rule, that "no memorandum in opposition [was] filed." Thus, defendants argued, the provision of the rule stating that in such an event "the Court will decide the matter on the record and such oral argument as the movant may be permitted to offer, if any" should apply.

After defendants made this argument, plaintiffs filed their First Amended Class Action complaint, followed in short order by a memorandum in opposition to the motion to dismiss. I have given full attention and weight to these filings. In light of the result reached in this opinion, I do not decide whether the out-of-time opposition should have been ignored or discounted by the Court.

ments that we held in *Raab* [not suitable to] constitute the basis for claims under the securities laws." 42 F.3d at 214; *see also Bentley v. Legent Corp.*, 849 F.Supp. 429, 432 (E.D.Va.1994) (regarding statements that business was "on plan" or "on target," defendant was "entitled to judgment as a matter of law," regardless of whether they were interpreted as "projections of future performance" or "statements of past fact"), *aff'd without pub. op. sub nom. Herman v. Legent Corp.*, 1995 WL 115879, 50 F.3d 6 (4th Cir. Mar. 20, 1995); *In re Syntex Corp. Sec. Litig.*, 855 F.Supp. 1086, 1095 (N.D.Cal.1994) (dismissing claim based upon statement of chairman and CEO that company was "doing well and I think we have a great future"; "[e]verything is clicking [for the 1990s] ... [n]ew products are coming in a wave, not in a trickle ... [o]ld products are doing very well," because such are "immaterial and too vague to have caused a reasonable investor to rely on them").

If one accepts plaintiffs' interpretation and views the statement that sales are "thus far ... at normal levels" as a statement or prediction as to third quarter performance as a whole, then I hold that the statement is legally indistinguishable from the statements in *Hillson* that the company was "on track" and "on target" for record earnings. Seen this way, each statement conveys that if things continue as they have been going, then a certain result will obtain at the end of the period in question; there is no guarantee, only a prediction. To be sure, neither the Normal Sales nor the "on track" statement is expressly qualified to warn the reader that if things change, so that sales are no longer normal or go "off track," then the prediction will fail. But that is only common sense. As the *Hillson* court notes, the "role of the materiality requirement is not to attribute to investors a childlike simplicity." 42 F.3d at 213.

The applicability of *Hillson* is underscored by plaintiffs' own oral argument. In the passage quoted supra, plaintiffs' counsel stated that the Normal Sales statement carried

with it "the necessary implication that [sales] are *on track* for the quarter." Tr. at 32 (emphasis added). Later in his argument, plaintiffs' counsel used the phrase again in referring to the Normal Sales statement: "If you say sales are on track, that also means I think that you are making a representation that the normal consequence of having sales at that normal level is you are going to be earning comparably to what you have done in the past." Tr. at 36 (emphasis added). Plaintiffs thus characterize the Normal Sales statement in the same terms held by the Fourth Circuit in *Hillson* not to be actionable.[12]

Taken as a prediction, as a statement that sales are "on track" to achieve some result down the road, the Normal Sales statement is not actionable as a matter of law.

2. *Dismissal Pursuant to Rule 9(b)*

Federal Rule of Civil Procedure 9(b) states, in part, that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *See Hillson*, 42 F.3d at 209. This heightened pleading requirement has been recognized to have three particular purposes:

> (1) to chill the filing of a suit merely as a means to conduct discovery; (2) to protect defendants ... from injury to reputation which may occur from a charge of fraudulent conduct; and (3) to insure that defendants are provided with concrete and particularized allegations so that a proper defense can be mounted.

*Breckley v. Amway Corp.*, Fed.Sec.L.Rep., 94,736 at 93,969, 1989 WL 140397 (D.S.C. Aug. 24, 1989) (citations omitted); *see also Pearlstine Distributors, Inc. v. Freixenet USA, Inc.*, 678 F.Supp. 133, 137 (D.S.C.1988) (RICO action; 9(b) protects "defendants against the harm to their reputations caused by baseless claims of fraud"); *Dubowski v. Dominion Bankshares Corp.*, 763 F.Supp. 169, 171 (W.D.Va.1991) (securities law); *Gol-*

---

12. It is also noteworthy that this argument attempts to turn the Normal Sales statement—which deals with sales alone—into a statement regarding earnings, which are not addressed in the statement. This further highlights the inability of plaintiffs to demonstrate that there was anything wrong with the statement as and when made.

*lomp v. MNC Financial, Inc.,* 756 F.Supp. 228, 232 (D.Md.1991) (securities law); *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 114–15 (2d Cir.1982).

In securities fraud class actions, courts have been particularly sensitive to the threat of strike suits and have been quick to insist that a complaint alleging securities fraud comply fully with the specificity requirement of Rule 9(b). This concern is founded on the Supreme Court's warning:

> There has been widespread recognition that litigation under Rule 10b–5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general.
>
> . . . .
>
> [I]n the field of federal securities laws governing disclosure of information even a complaint which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment. The very pendency of the lawsuit may frustrate or delay normal business activity of the defendant which is totally unrelated to the lawsuit.

*Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 739–40, 95 S.Ct. 1917, 1927, 44 L.Ed.2d 539 (1975). Even the specter of costly discovery may force a plaintiff to settle on terms bearing little relation to the actual merits of the lawsuit. Heeding this warning, the courts require plaintiffs to plead with particularity each element of a fraud claim. See, *e.g., Decker,* 681 F.2d at 115 ("[b]ecause the in *terrorem* effect of such unfettered discovery would, to say the least, be substantial, it is important that the wheat in plaintiff's pleading be separated from the chaff").

This particularity requirement includes the element of scienter—knowledge on the part of defendants of the falsity or misleading nature of the statements in question. "Although Rule 9(b) provides that conditions of the mind may be averred generally, [plaintiff] must supply a factual basis for [his] conclusory allegations regarding [scienter]. Bald or boilerplate assertions of recklessness do not properly invoke knowledge which is indicative of scienter." *Breckley v. Amway Corp., Fed.Sec.L.Rep.* 94,736 at 93,970, 1989 WL 140397 (citations and internal quotations omitted). Or, as the First Circuit has summarized established law, "[t]he courts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity, unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Greenstone v. Cambex Corp.,* 975 F.2d 22, 25 (1st Cir.1992). See also, *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990) (plaintiff must allege specific facts that give rise "to a 'strong inference' of fraudulent intent").[13]

There is yet another reason to undertake the Rule 9(b) inquiry with particular care in this case. "[T]his suit is not only against individuals, but also against the corporation, and, thus, against the shareholders themselves." *Borow v. nVIEW Corp.,* 829 F.Supp. 828, 832 (E.D.Va.1993), *aff'd without pub. op.* 27 F.3d 562 (4th Cir.1994). It is thus an attempt by a small subset of shareholders to impose liability on their fellows. "Under these circumstances, the Court must be particularly careful to analyze broad allegations of fraud in light of the effects of proceeding on all of the shareholders." *Id.*

In their initial Complaints, plaintiffs' allegations of the falsity of the Comfort state-

---

**13.** In its recent decision in *Acito v. IMCERA Group,* the Second Circuit observed that a plaintiff may successfully plead scienter by "alleging facts establishing a motive to commit fraud and an opportunity to do so." 47 F.3d 47 (2d Cir. 1995). The plaintiffs in *Acito* argued (unsuccessfully) that the motive to defraud could be inferred from the existence of an incentive compensation plan tied to stock performance and from the sale by one defendant of a portion of his shares during the time that the share price was allegedly inflated. Noteworthy by its absence from the instant case is any sort of similar allegation that defendant Jacobs profited from the alleged fraud by selling shares during the putative class period. Since public disclosure of any such sale would be required by the securities laws, it seems likely that plaintiffs would have made such an allegation had there been support for it.

ment and the Normal Sales statement consisted only of the claim that these statements were false because "sales had already deteriorated dramatically.... margins had materially declined, and ... demand for [One Price's] products had materially weakened." The observation of the District Court in North Carolina in a similar case applies with equal force here: "Although these allegations may at first blush have the appearance of specificity, in substance they are conclusory and fail to provide an adequate factual basis for an inference of fraud and scienter." *Martin v. Prudential–Bache Securities, Inc.,* 820 F.Supp. 980, 983 (W.D.N.C.1991), *aff'd without pub. op. sub nom. Juntti v. Prudential–Bache Secs., Inc.,* 993 F.2d 228 (4th Cir. 1993).

Analysis of these allegations reveals that they are conclusory; the reader searches in vain for a link between plaintiffs' bold statements and any factual basis for an inference of fraud or scienter. Plaintiffs failed in their initial Complaints to meet the requirement, recently stated by the Fourth Circuit, that they "identify in the complaint with specificity some reason why the discrepancy between a company's optimistic projections and its subsequently disappointing results is attributable to fraud." *Hillson,* 42 F.3d at 209.

Stripped of its sweeping language, all the initial Complaints did was to quote a statement attributed to One Price or Henry Jacobs and then allege the contrary. Authorities are clear and plentiful that such pleading will not satisfy Rule 9(b):

> In essence, plaintiffs claim the defendants maintained grossly inadequate loan loss reserves; the defendants understated non-performing loans; the defendants overconcentrated the loan portfolio in the real estate sector; the Corporation's credit review and authorization standards and policies were not functioning properly; and the Corporation's lending practices and controls had become unmanageable. *To support these claims, plaintiffs merely quote defendants' representations from January 1989 to July 1990 and* **then state that the** *inverse was true. Plaintiffs fail to provide any separate facts in support of their claims.*

*Dubowski,* 763 F.Supp. at 174 (emphasis added).

> *[Plaintiff attempts to plead fraud by]* quoting pertinent favorable narrative statements in Massey's reports and then alleging the contrary of each statement. Where Massey states that it has adopted advanced technology to solve distribution problems, plaintiff asserts that the company does not operate at the level of technological sophistication implied. Massey's claim of broad distribution strength is met by plaintiff's allegation that Massey's distribution system is unworkable. Massey's claim of effective coordination, planning, and control is countered with an allegation that the Company's growth was "haphazard and uncoordinated, and unaccompanied by adequate operational, managerial and financial controls or return on investment." *Generalized allegations such as these are completely inadequate.*

*Decker,* 681 F.2d at 115–16 (emphasis added; citations omitted).

> The complaint basically recites a series of financial reports, press releases and other information available to the public and then alleges that these were all false and misleading and were made with knowledge or reckless disregard of their false nature or misleading qualities. The complaint falls far short of providing an adequate factual basis for an inference of fraud and scienter.

*Heller v. NCNB Corp.,* 768 F.Supp. 167, 169 (W.D.N.C.1991).

Apparently recognizing this frailty, plaintiffs filed their amended Complaint, which differs from the original Complaints primarily in its inclusion of certain specific "facts" alleged to make the Comfort and Normal Sales statements knowingly false or misleading when made.[14] With one exception, how-

---

14. These new facts, set forth above, were: (a) that average per store inventory at the end of the second quarter was up 9% over the comparable period for the previous year; (b) that excessive amounts of warm weather merchandise had been purchased and shipped late in the season; (c) that the store or stores in Puerto Rico had excessive inventory; (d) that an ongoing change in

ever, the new facts lack the critical element of timing that could make them relevant. There is no way to determine from the Complaint when these new facts came into being or to be known by defendants. Absent this, they contribute nothing.

■ The first new fact pled is the one exception to this timing problem. Plaintiffs allege that average per store inventory at the end of the second quarter of 1994 was up 9% over the comparable period for the prior year. This is a fact alleged to have been in existence prior to the Comfort and Normal Sales statements. Putting to one side the question of whether this difference in inventory levels would be material to One Price's business, however, the simple fact is that One Price disclosed this increase in inventory levels at the outset of the alleged class period—indeed, in the very *10–Q that contains the Normal Sales statement.* See Complaint ¶ 30.[15] Thus, this publicly disclosed fact cannot support plaintiffs' claim of knowing falsity. When a fact is made public, it is presumed to be part of the mix of information available to the market, and it cannot be the basis for a securities fraud claim. See, *e.g., Raab,* 4 F.3d at 289.

The next three facts—the purchase of excessive *warm weather merchandise,* excess inventory in Puerto Rico, and the change in One Price's distribution center from hanging pack to flatpack—were all revealed in One Price's 10–Q for the third quarter of 1994, signed on November 11, 1994. Plaintiffs recite these statements in their Complaint and claim that they demonstrate that the Comfort and Normal Sales statements were false, and known to defendants to be false, when made. Complaint ¶¶ 39–42.

All that can be said from the Complaint, however, is that these facts were known to defendants on or about November 11, long after the close of the alleged class period. Plaintiffs suggest that, because defendants knew these facts on November 11, the facts must have existed and defendants must have known them earlier. But there is nothing in the Complaint that would support such an assumption. As then-Circuit Judge Breyer wrote in a passage cited by the Fourth Circuit with approval in *Hillson,* 42 F.3d at 217, a "general averment" that one can infer from a negative event or poor performance that the defendant had earlier knowledge of that event or performance "without more, will not do." *Greenstone v. Cambex Corp.,* 975 F.2d 22, 25–26 (1st Cir.1992); *see also Acito v. IMCERA Group,* 47 F.3d 47 (2d Cir.1995) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud").

Once again, the situation here is indistinguishable from *Hillson.* The plaintiff there pointed to the defendant's later acknowledgement in its third-quarter report that an equipment installation took "longer than planned," and argued that this showed that there was "no reasonable basis" for the defendant's earlier statement that the installation was "on schedule." 42 F.3d at 213. The Fourth Circuit flatly rejected this argument. The fact that the installation was ultimately delayed did not constitute evidence that the earlier statement was not accurate when made, or that the defendant did not believe it to be accurate at that time. "An inability to foresee the future does not constitute fraud." *Id.; see also id.* at 217 (plaintiff must "allege facts showing that the company did not believe these predictions were accurate at the time they were made").

Plaintiffs attempt to propel these facts backwards in time by reliance on their final fact—that One Price had a "sophisticated management information system [that] gave it intimate and immediate knowledge of sales

One Price's distribution center from hanging pack (shipment of garments on hangers) to flatpack (shipment of folded garments in boxes) was disrupting One Price's ability to restock stores; (e) that these distribution problems "would necessarily have an adverse impact on sales"; and (f) that One Price had a sophisticated management information system that gave it "intimate

and immediate knowledge of sales and inventory levels."

15. Indeed, the August 24 *Dow Jones Newswire article*—the other allegedly misleading document in this case—also contains a discussion of this increase in inventory.

and inventory levels." [16] In the first place, the Court is uncomfortable with the implication of plaintiffs' argument that any company with relatively sophisticated internal controls should be presumed as a matter of law to have knowledge of all facts related to its business at the moment those facts arise. This leap from computer ownership to omniscience sweeps too broadly. *See Hillson*, 42 F.3d at 217.

The point here, however, is a narrower one. Even if one accepts plaintiffs' contention that One Price had knowledge of all facts at the moment those facts came into being, plaintiffs' Complaint fails. This is so because plaintiffs have failed to offer any allegation that would show that any of the facts on which it relies (other than the slight increase in inventories, which was disclosed) actually came into being before the allegedly misleading statements. Everything that Plaintiffs have alleged is entirely consistent with the truth, and the belief in the truth, of the Comfort and Normal Sales statements at the time they were made. Plaintiffs fail the requirement of Rule 9(b) because they say nothing that shows that the statements in issue were false or misleading when made, or that defendants had any knowledge of any such falsity at that time.

Accordingly, dismissal of the 10b–5 claims in this case is appropriate under Rule 9(b) as well as under Rule 12(b)(6).

### 3. *Plaintiffs' Conspiracy Claims*

■ Although the Complaint does not contain a separate count for conspiracy to violate 10b–5, it is nevertheless replete with allegations that One Price and Henry Jacobs acted in "concert" or "conspiracy." To the extent that these claims are designed to state a separate claim under 10b–5, recent Supreme Court authority makes it clear that they cannot.

In its recent decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* — U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court

held that there is no cause of action for "aiding and abetting" a 10b–5 violation:

> [W]e ... conclude that the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act.... The proscription does not include giving aid to a person who commits a manipulative or deceptive act. We cannot amend the statute to create liability for acts that are not themselves manipulative or deceptive within the meaning of the statute.

— U.S. at ——, 114 S.Ct. at 1448.

This passage makes it clear that allegations of concert or conspiracy, seeking or suggesting secondary liability for the conduct of others, are insufficient as a matter of law. As one court has noted in the wake of *Central Bank*, the Court's rationale applies not only to "aiding and abetting" liability, but to any theory of secondary liability not provided for in the statute; thus, *Central Bank* "forecloses Plaintiffs' conspiracy liability theory." *In re Syntex Corp. Sec. Litig.,* 855 F.Supp. at 1098; *see also In re Faleck & Margolies, Ltd.,* 1995 WL 33631, *12, 1995 U.S.Dist. LEXIS 970 at *34–*37 (S.D.N.Y. Jan. 30, 1995) (*Central Bank* precludes an action for conspiracy to commit securities fraud). Indeed, the dissenting opinion in *Central Bank* recognized this implication of the Court's opinion. See —— U.S. at —— n. 12, 114 S.Ct. at 1460 n–12 (Stevens, J., dissenting) (noting that the Court's rationale would also preclude liability based on conspiracy to violate Rule 10b–5, as well as respondeat superior and other common law agency principles). Plaintiffs cannot maintain an action for conspiracy to commit securities fraud.

### 4. *Liability of Henry Jacobs Under Section 20(a)*

■ Plaintiffs also seek to impose personal liability on Henry Jacobs on the basis of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), which makes a "controlling person" jointly and severally

---

**16.** The remaining "fact" from plaintiffs' list—that problems in the conversion of the distribution Bystem from hanging pack to flatpack "would necessarily have an adverse impact on sales"—is not a separate fact at all, but an argument. It adds nothing to plaintiffs' other allegations.

liable with the controlled entity for violations of the Act. Thus, the liability imposed by Section 20(a) is purely derivative of the controlled entity's liability. *See, e.g., Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 279 (3d Cir.1992) ("'controlling person' liability can exist only if primary liability has been established as to another defendant").

In this case, because the 10b–5 action against One Price must be dismissed, the Section 20(a) action must fail as well.

### B. *Plaintiffs' State Law Claims*

The remaining counts of the Complaint, counts II and III, sound in common law negligent misrepresentation and fraud, respectively. Plaintiffs rely for these causes of action on the same factual allegations already discussed, and dismissal of these state law claims is appropriate for the reasons discussed above. In addition, the negligent misrepresentation claims fails to allege a duty running from Defendants to Plaintiff.

### 1. *Failure to State a Claim*

■■■ South Carolina's courts have made it clear that negligent misrepresentation and fraud claims—much like a 10b–5 action—can be based only on misrepresentations of material fact. To be actionable, a representation "must relate to a present or pre-existing fact"; a claim "cannot ordinarily be based on unfulfilled promises or statements as to future events." *Fields v. Melrose Ltd. Partnership,* 312 S.C. 102, 439 S.E.2d 283, 285 (App.1993) (negligent misrepresentation claim); *Woods v. State,* 431 S.E.2d 260, 263 (S.C.App.1993) (same for fraud claim).

As the Court has discussed in detail supra, neither of the statements relied on by plaintiffs qualifies under this standard.

### 2. *Rule 9(b).*

Plaintiffs' common law claims rest upon the same allegations as their 10b–5 claims. Because the federal claims fail to satisfy Rule 9(b), the common law claims likewise fail and should be dismissed.

■■■ This conclusion applies not only to the fraud claim, but to the negligent misrepresentation count as well. "Although the language of Rule 9(b) confines its requirements to claims of mistake and fraud, the requirements of the rule apply to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud." *Toner v. Allstate Ins. Co.,* 821 F.Supp. 276, 283 (D.Del.1993) (applying 9(b) requirement to breach of good faith claim; citing cases applying 9(b) to misrepresentation and negligent misrepresentation); *see also Lubin v. Sybedon Corp.,* 688 F.Supp. 1425, 1453–54 (S.D.Cal.1988) (dismissing fraud and negligent misrepresentation claims under Rule 9(b)).

### 3. *The Absence of a Duty to Plaintiffs.*

■■■ To state a claim for negligent misrepresentation in South Carolina, a plaintiff must allege that the defendant owed a duty of care to communicate truthful information to that plaintiff.[17] As a number of courts have explained, plaintiffs, as members of the investing public at large, were not owed a duty that would support an action for negligent misrepresentation.

This point was directly addressed in *In re Delmarva Securities Litigation,* 794 F.Supp. 1293, 1310–11 (D.Del.1992). Relying on the *Restatement (Second) of Torts,* the District Court held that "a claim of negligent misrepresentation may be brought only by members of a limited group of persons for whose benefit and guidance' the information is intended." The court expressly rejected the

---

17. The elements of a negligent misrepresentation claim in South Carolina are:
(1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance on the representation.
*Fields v. Melrose Ltd. Partnership,* 312 S.C. 102, 439 S.E.2d 283, 285 (App.1993).

argument that negligent misrepresentation claims should be available to all potential investors in the company's stock. This would "yield the undesirable result that those who committed a negligent misrepresentation in corporate publicly filed documents would be liable to a broader universe of plaintiffs than if the same statements constituted fraud." 794 F.Supp. at 1311.

South Carolina authorities indicate the same result. The leading South Carolina case recognizing the negligent misrepresentation cause of action relied on the *Restatement (Second) of Torts,* which is the source of the ruling in *In re Delmarva. See Winburn v. Insurance Co. of N. Am.,* 287 S.C. 435, 339 S.E.2d 142, 146–47 (App.1985). And the principle of limiting liability to a defined class of individuals with a particular nexus *Carolina State Ports Authority v. Booz–Allen & Hamilton, Inc.,* 289 S.C. 373, 346 S.E.2d 324 (1986). In the *Ports Authority* case, the Supreme Court declined to extend causes of action to parties with acknowledged pecuniary interest in the alleged misstatements. *"The concept of duty in tort liability must not be extended beyond reasonable limits." Id.* (emphasis added). Echoing *Delmarva, Ports Authority* establishes that where there is a specific individual or definable group that can be expected, before the fact, to rely on a particular statement, some duty to that group may arise. No such duty can run, however, to groups with only an attenuated relationship to the statement, such as the investing public at large.

Other courts have concurred in the area of securities litigation. In *In re Coleco Securities Litigation,* 591 F.Supp. 1488, 1493 (S.D.N.Y.1984), the court held that the tort of negligent misrepresentation was created to provide a cause of action for a limited, foreseeable group of persons. The court concluded that the action could not be maintained on the basis of an offering of stock to the public at large, because that would create a claim "on behalf of a classically 'faceless or unresolved class of persons,' prospective investors." *Id.* Similarly, in *Brickman v. Tyco Toys, Inc.,* 722 F.Supp. 1054, 1062 (S.D.N.Y.1989), the court required the plaintiff asserting negligent misrepresentation to show that "a defendant was aware of a specific party or class of parties which intended to rely upon the defendant's statement." 722 F.Supp. at 1062. Because the alleged misstatements appeared in press releases and SEC filings, all of which were disseminated to the public at large, that requirement was not met. *See also Moskowitz v. Vitalink Communications Corp.,* 751 F.Supp. 155, 160 (N.D.Cal.1990); *Moskowitz v. Vitalink Communications Corp.,* 751 F.Supp. 155, 160 (N.D.Cal.1990); *In re Consumers Power Co. Sec. Litig.,* 105 F.R.D. 583 (E.D.Mich.1985).

Upon consideration, the Court concludes that the plaintiffs have not alleged cognizable state law claims.

### CONCLUSION

After affirming the dismissal in *Hillson,* the Fourth Circuit reflected on the relatively stringent standards that securities law plaintiffs must meet in order to survive a motion to dismiss:

At first blush, those principles may seem, as a matter of policy, to require too much of a plaintiff in a securities case. On reflection, however, we believe that they strike an entirely appropriate balance. Plaintiffs who can allege they have been injured by reliance on fraudulent misstatements or omissions of material current facts can state a cause of action. Those ... who can only allege injury from purported reliance on future projections that did not prove accurate and so for this reason assertedly must be fraudulent, cannot. These are, to be sure, rigorous requirements that do, and will continue to, eliminate many claims at a preliminary stage. This seems justified, however, because "in this type of litigation ... the mere existence of an unresolved lawsuit has settlement value to the plaintiff not only because of the possibility that he may prevail on the merits, an entirely legitimate component of settlement value, but [also] because of the threat of extensive discovery and disruption of normal business practices." *Hillson,* 42 F.3d at 220 (citation omitted).

Whatever harshness there may be in this rule is justified here. Stripped of its hyper-

bole and innuendo, plaintiffs' Complaint amounts to the following: (i) defendants announced on September 19 that One Price's earnings would be less than previously expected; (ii) One Price's share price dropped in the wake of this announcement; (iii) One Price subsequently made public factors explaining this reduction in earnings; and (iv) One Price should have known and disclosed these factors earlier than it did.

This is a classic case of what Judge Friendly termed "fraud by hindsight." *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978). Plaintiffs argue that because the earlier predictions did not pan out, they must have been fraudulent when made. But "hindsight does not establish fraud. If it did, any drop in the price of shares would result in lawsuits from disappointed investors. The market has risks; the securities laws do not serve as investment insurance." *Raab*, 4 F.3d at 291.

For the reasons stated above, the defendants' motions to dismiss are hereby granted. These actions are dismissed.[18]

IT IS SO ORDERED.

---

**18.** At argument and in their opposition to the motion to dismiss, plaintiffs have requested yet another opportunity to replead, in the event that the motion to dismiss is granted. The Court observes that the plaintiffs had ample opportunity to investigate and research this claim between the filing of the initial Complaints and the Amended Complaint. The Court has seen no indication that further leave to amend will result in anything new in this case, and the request for further leave is denied. *See Raab*, 4 F.3d at 291 (approving denial of request for leave to amend which would allow plaintiffs "a second chance to add scatter-shot allegations to their complaint"); *In re Philip Morris Securities Litigation*, 872 F.Supp. 97, 103 n. 6 (S.D.N.Y.1995) (denying request to replead as it would not "cure the failure to have adequately pleaded fraud by foresight"); *Acito*, 47 F.3d at 53.