**Mead Ann KRIM, on her own behalf and on behalf of all others similarly situated, Plaintiff,**

v.

**COASTAL PHYSICIAN GROUP, INC.; Steven M. Scott; Stephen D. Corman; and Jonathan E. Kennedy, Defendants.**

**Civil No. 97CV01126.**

United States District Court, M.D. North Carolina.

July 31, 1998.

Laurie B. Gengo, Daniel Gerald Cahill, The Sanford Holshouser Law Firm, Raleigh, NC, Mark Levine, Stull Stull & Brody, New York City, Harvey Greenfield, The Law Firm of Harvey Greenfield, New York City, for Mead Ann Krim, Arthur Peros, Carole Stang, Richard Thurlow, James D. Campbell, Phillip J. Franzoni, Anthony J. Iadanza.

William Kearns Davis, Bell, Davis & Pitt, P.A., Winston–Salem, NC, James Conrad Adams, II, Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, NC, for Coastal Physician Group, Inc., Jonathan E. Kennedy.

Mack Sperling, Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, NC, James Conrad Adams, II, Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, NC, for Steven M. Scott.

James Conrad Adams, II, Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, NC, H. Spencer Barrow, Raleigh, NC, J. Roger Edwards, Raleigh, NC, for Stephen D. Corman.

Laurie B. Gengo, The Sanford Holshouser Law Firm, Raleigh, NC, Mark Levine, Stull Stull & Brody, New York City, for John R. Booth, Jr.

*MEMORANDUM OPINION*

BULLOCK, Chief Judge.

In this action, which asserts claims for securities fraud under federal law and neg-

ligent misrepresentation under state law, Defendants jointly move to dismiss the amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, the court will grant Defendants' motion.

## FACTS

In assessing whether Plaintiff's amended complaint fails to state a claim upon which relief can be granted, the court construes the amended complaint in the light most favorable to the Plaintiff and its allegations are taken as true. Plaintiff Mead Ann Krim purchased 250 shares of the common stock of Defendant Coastal Physician Group, Inc. ("Coastal") on November 1, 1995. Plaintiff purports to represent a class of persons who bought Coastal common stock during the alleged class period of August 14, 1995, through August 29, 1997 (the "Class Period").[1]

Defendant Coastal, which has its principal place of business in Durham, North Carolina, is one of the largest publicly traded physician management groups in the country. Defendant Steven M. Scott was the president and chief executive officer of Coastal at all times relevant to this action. Defendant Stephen D. Corman was the executive vice president, chief financial officer, and a director of Coastal at all times relevant to this action. Defendant Jonathan E. Kennedy was the vice president and corporate controller of Coastal during part of the Class Period.

Approximately two months before Plaintiff purchased her stock, Coastal began reporting significant operating losses in its business. The quarterly report filed immediately before Plaintiff's purchase reported a net loss of more than $10 million. Net losses of varying magnitudes, all but one in excess of $10 million, continued throughout the Class Period. Significantly, Plaintiff

does not allege that Coastal misstated its financial condition at any time during the Class Period. Indeed, Plaintiff does not contend that the Defendants covered up Coastal's declining financial condition. Instead, Plaintiff simply complains that Defendants "failed to disclose *the extent* [of] the problems with Coastal's billing system." (Pl.'s Am.Compl. ¶¶ 24, 32, 36, 41, 46, 51, 56, 61, and 65 (emphasis added)).

More specifically, Plaintiff makes the following allegations:

1. On August 14, 1995, Coastal filed with the SEC its Form 10–Q for the quarter and six-month period ended June 30, 1995 (the "Second Quarter 1995 Form 10–Q"), signed by Defendants Corman and Kennedy. In the notes to the consolidated financial statements, the Second Quarter 1995 Form 10–Q stated that Coastal had incurred approximately $1 million of expenses related to the processing of charts in its billing operations. It also stated that Coastal wrote off certain costs associated with the computer software which was being replaced in its billing operations, amounting to a charge of $1,150,000.00 in non-operating expenses. Additionally, in the "Results of Operation" section of the Management's Discussion and Analysis ("MD & A"), the Second Quarter 1995 Form 10–Q identified numerous factors that contributed to its poor financial performance for the second quarter of 1995 as compared with the second quarter of 1994. Among the factors that Coastal identified as contributing to its increase in operating expenses was an increase in the number of days required to process statements in the company's fee-for-service billing operations. Finally, in a section of the MD & A entitled "Trends," the Second Quarter 1995 Form 10–Q stated that Coastal was implementing a new common computerized billing system and identified the anticipat-

**1.** Plaintiff's husband, Jerry Krim, is currently the plaintiff in a separate lawsuit against Coastal. *Jerry Krim v. Coastal Physician Group, Inc., et al.,* No. CVS4668 (Durham County Superior Court). That action, which is based upon the same shares as those owned by Plaintiff in this case, involves allegations of conduct unrelated to the allegations made in this case.

ed benefits and impact that the new system would have on Coastal's business. Coastal explained that the new billing system was

> expected to result in lower days sales outstanding for the Company by decreasing the backlog of unprocessed billing information, reducing processing time for bills and producing more timely and complete billing statements that should improve collection results. If achieved, these actions are expected to reduce the trend of increasing allowances for contractual adjustments and uncollectibles and reduce the Company's borrowings under its Working Capital Facility.... Implementing this new strategy will result in additional costs during the start-up phases of the initiatives with no significant financial benefits anticipated until 1996.

(*Id.* at ¶ 22).

2. On November 10, 1995, the *Herald-Sun* from Durham, North Carolina, reported that in a conference call with analysts Defendant Scott predicted that Coastal would "rebound after selling the bulk of its southern Florida clinics and after bringing a new computerized billing system on line." (*Id.* at ¶ 25).

3. On November 13, 1995, Coastal filed its Form 10–Q for the quarter and nine-month period ending September 30, 1995 (the "Third Quarter 1995 Form 10–Q"), signed by Defendants Scott and Corman, with the SEC. The Third Quarter 1995 Form 10–Q MD & A identified numerous factors that contributed to Coastal's drop in operating income, including the "continued adverse trend in collection experience." (*Id.* at ¶ 28). Coastal also explained that its decrease in operating income was also related to "increased costs to implement new information systems to improve billings and collections." (*Id.* at ¶ 29). Finally, the Third Quarter 1995 Form 10–Q included statements attributing Coastal's increase in borrowings for operating activities in part to an increase in the number of days required to process billing statements. The Third Quarter 1995 Form 10–Q also discussed the impact that the new billing system would have on Coastal's operations.

4. On May 31, 1996, Coastal filed with the SEC its Form 10–K for the year ended December 31, 1995 (the "1995 Form 10–K"), signed by Defendants Scott and Corman. As with the previously discussed Form 10–Q's, the 1995 Form 10–K's's MD & A discussed Coastal's decision to implement a "common computerized billing system" and the anticipated impact the new system would have on Coastal's business. The 1995 Form 10–K also stated that the number of days of revenue in average outstanding accounts receivable had increased from 63.6 days in 1994 to 76.1 days in 1995. Coastal attributed this increase in part to "the ongoing implementation of a common computerized billing system to be used by all of the Company's billing operations." (*Id.* at ¶ 35).

5. On June 10, 1996, Coastal filed with the SEC its Form 10–Q for the quarter ending March 31, 1996 (the "First Quarter 1996 Form 10–Q"), signed by Defendant Corman. The MD & A again partially attributed Coastal's poor financial performance to the "continued adverse trend in collection experience." (*Id.* at ¶ 39). Coastal also discussed its implementation of new information technology systems, including its new computerized billing system.

6. On August 14, 1996, Coastal filed with the SEC its Form 10–Q for the quarter and six-month period ending June 30, 1996 (the "Second Quarter 1996 Form 10–Q"), signed by Defendant Corman. The MD & A identified the reasons for yet another disappointing quarter as including "lower net collections per patient visit by the Company's billing and accounts receivable management services division." (*Id.* at ¶ 44). Coastal also discussed implementation of new information technology systems, including its new computerized billing system.

7. On November 14, 1996, Coastal filed with the SEC its Form 10–Q for the quarter and nine-month period ending September 30, 1996 (the "Third Quarter 1996 Form 10–Q"). The Third Quarter 1996 Form 10–Q contains statements about Coastal's billing system which were nearly identical to those contained in its Second Quarter 1996 Form 10–Q.

8. On June 12, 1997, Coastal filed with the SEC its Form 10–K for the year ending December 31, 1996 (the "1996 Form 10–K"), signed by Defendant Scott. Coastal stated that it had substantially completed its "migration to a common computerized billing system during 1996." (*Id.* at ¶ 53). Consistent with its prior Form 10–Q's, Coastal attributed part of its poor financial performance for the year to "lower net collections per patient visit and reimbursement regulatory changes experienced by the Company's billing and accounts receivable management division." (*Id.* at ¶ 54). The 1996 Form 10–K also attributed an increase in the number of days of revenue in outstanding accounts receivable to the "implementation of a common computerized system to be used by all of the Company's billing operations." (*Id.* at ¶ 55).

9. On June 11, 1997, Coastal filed with the SEC its Form 10–Q for the quarter period ending March 31, 1997 (the "First Quarter 1997 From 10–Q"). Coastal reported that its decrease in operating revenue was primarily due to disposition of certain of its assets. Coastal also indicated that the decline in operating revenue was likely to continue because of this strategy to divest itself of certain assets. Coastal did not, however, attribute any part of its decrease in operating revenues to problems it was allegedly experiencing with a billing system.

10. On August 22, 1997, Coastal filed with the SEC its Form 10–Q for the quarter and six-month period ending June 30, 1997 (the "Second Quarter 1997 Form 10–Q"), signed by Defendant Scott. Coastal again explained that its decrease in operating revenue for that period was the result of its disposition of certain assets, contract attrition, and less business development. Coastal did not, however, attribute any part of its decrease in operating revenues to problems it was allegedly experiencing with its billing system.

Plaintiff contends that all of these statements were materially false and misleading because they failed to disclose the extent of the problems Coastal was experiencing with its billing system. Plaintiff alleges that the true state of affairs was revealed to the public on August 29, 1997, at Coastal's annual meeting of shareholders. At that meeting, Scott explained that Coastal's billing unit had been a "mess." (*Id.* at ¶ 36). Prior to the installation of a single set of software in the billing department, according to Scott, Coastal had written software to collect bills that did not work and had three sets of software that were not compatible. Scott stated, "We did not send out bills for a year, and that hurts cash flow." (*Id.* at ¶ 66).

Based on these allegations, Plaintiff alleges that each Defendant knowingly and recklessly violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 14 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated pursuant to Section 10(b) by the SEC. Plaintiff further asserts that the individual defendants are liable under Section 20(a) of the Exchange Act, 14 U.S.C. § 78t(a), as control persons. Finally, Plaintiff asserts a claim for negligent misrepresentation under North Carolina law.

Defendants have moved to dismiss the case in its entirety under Rule 12(b)(6). In connection with Plaintiff's securities claims, Defendants contend that (1) the alleged misstatements or omissions contained in the amended complaint are not material; (2) Plaintiff's factual allegations of scienter are insufficient; and (3) Plaintiff fails to allege loss causation. Defendants also contend that the court should

dismiss the claim for negligent misrepresentation for failure to plead actual reliance or, in the alternative, that the court should decline to exercise its supplemental jurisdiction over this claim.

## DISCUSSION

■ Dismissal under Rule 12(b)(6) is proper when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering a motion to dismiss, the court accepts as true all well-pleaded allegations and views the complaint in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993).[2]

### I. *Plaintiff's Claim under Section 10(b) and Rule 10b–5*

Section 10(b) of the Exchange Act makes it

> unlawful for any person ... [t]o use or employ in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5, which the SEC promulgated under Section 10(b), provides in relevant part:

> It shall be unlawful for any person ... [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection

with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

■ To establish liability under Section 10(b) and Rule 10b–5, a plaintiff must plead and prove: (1) that the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages. *See Gasner v. Board of Supervisors of the County of Dinwiddie, Virginia*, 103 F.3d 351, 356 (4th Cir.1996); *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 208 (4th Cir.1994); and *Malone v. Microdyne Corp.*, 26 F.3d 471, 476 (4th Cir.1994).

■ Allegations of securities fraud must also meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure which requires that "the circumstances constituting the fraud or mistake shall be stated with particularity." In addition, Plaintiff's allegations must satisfy the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u–4, which amended the Exchange Act by heightening the pleading requirements for private actions alleging securities fraud. First, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts upon which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Second, where state of mind is an element of plaintiff's claim, as with claims under Section 10(b), the PSLRA provides that "the complaint shall state with particularity facts giving rise to a strong inference that the defendant acted with the required state of

---

**2.** On a motion to dismiss, the court must generally limit itself to consideration of the facts alleged on the face of the complaint. Fed.R.Civ.P. 12(b). Nevertheless, in a securities fraud case a court may consider the relevant SEC filings and newspaper articles referenced by and integral to the complaint without converting the motion to dismiss into a motion for summary judgment. *In re FAC Realty Securities Litigation*, 990 F.Supp. 416, 420 (E.D.N.C.1997).

mind." 15 U.S.C. § 78u–4(b)(2). If a plaintiff's complaint fails to meet either of these requirements, the PSLRA directs a court to dismiss the complaint on motion of the defendant. 15 U.S.C. § 78u–4(b)(3).

## A. *Immateriality of Defendants' Alleged Misrepresentations*

■ Defendants first attack the materiality of the alleged misrepresentations contained in Plaintiff's amended complaint. For a misrepresentation or omission to violate Rule 10b–5 it must of course be material. A misrepresented or omitted fact is material if a substantial likelihood exists that a reasonable investor would have viewed the true facts or the omitted fact as having significantly altered the total mix of information made available. *Basic, Inc. v. Levinson,* 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The question of materiality is generally fact-specific and thus typically cannot be resolved as a matter of law. *Id.* at 236, 108 S.Ct. 978. Nevertheless, a court may dismiss a complaint for failure to state a claim under Rule 12(b)(6) when the alleged misrepresentations or omissions are so obviously unimportant to investors that reasonable minds could not differ on the question of materiality. *See, e.g., Raab v. General Physics Corp.,* 4 F.3d 286 (4th Cir.1993) (affirming dismissal of securities fraud complaint for, *inter alia,* the alleged misstatements' lack of materiality).

■ Defendants' statements which Plaintiff attacks are of two types: (1) forward-looking or predictive statements; and (2) backward-looking or descriptive statements. Predictive statements are much less likely to be actionable under the securities laws because the reasonable investor knows of the risks and uncertainties involved in predicting the future. Therefore, predictive statements are not actionable under Rule 10b–5 unless they are supported by specific statements of fact or worded as guarantees. *See Malone,* 26 F.3d at 479. Only two of Defendants' statements fall into the category of pre-

dictive: (1) Scott's statement, reported in the *Herald–Sun,* predicting that Coastal would rebound after selling some of its clinics and after implementing a new computerized billing system; and (2) Defendants' alleged statement in Coastal's First Quarter 1997 Form 10–Q that any further decline in operating revenue would result only from Coastal's strategy to divest itself of assets. (Pl.Am.Compl.¶¶ 25, 60).

In neither instance, however, did Defendants offer specific statements of fact in support of the prediction, or word the prediction in the form of a guarantee. Scott's statement is nothing more than a general prediction of growth. Coastal's First Quarter 1997 Form 10–Q, in stating that a further decline in operating revenue would likely result from further selling off of assets, provided no guarantee as to future events. Both statements clearly constitute the type of vague predictions of performance that the Fourth Circuit has in the past held not to be material as a matter of law. *See, e.g., Raab,* 4 F.3d at 289 (finding immaterial defendant's statements of "expected annual growth rate of 10% to 30%" and positioning "to carry the growth and success of 1991 well into the future"); *Malone,* 26 F.3d at 479 (finding immaterial a defendant's statement of "comfort" with an analyst's predictions of growth); and *Hillson,* 42 F.3d at 212 (finding immaterial a defendant's predictions that a subsidiary's performance should improve and that the year would "produce excellent results"). As such, Defendants' predictive statements are not actionable under Section 10(b) and Rule 10b–5.

The remainder of the statements of which Plaintiff complains constitute descriptive statements of fact. In her amended complaint, however, Plaintiff does not allege that Defendants made any affirmative misrepresentation of fact. Plaintiff also does not challenge the accuracy of any of Defendants' statements of present fact. Rather, Plaintiff complains that Defendants did not disclose the extent of the problems in Coastal's billing system

in sufficient detail and that this omission was materially misleading.

Examination of the filings cited in Plaintiff's amended complaint, however, reveals that Coastal consistently referenced, in a plain and obvious manner, the problems with its old billing system and the costs associated with its transition to a new billing system. For example:

(1) Coastal's Second Quarter 1995 Form 10–Q stated that losses had been caused in part by "an increase in the number of days required to process statements in the Company's fee-for-service billing operation," "the backlog of unprocessed billing information," and "the trend of increasing allowances for contractual adjustments and uncollectibles." (Pl.'s Am.Compl. ¶ 22).

(2) Coastal's Third Quarter 1995 Form 10–Q explained that the company's losses were caused in part by "reduced margins in the hospital-based contract management and billing and collections business," "the continued adverse trend in collection experience," "an increase in the number of days required to process statements in the Company's billing operations," and "the backlog of unprocessed billing information." (Id. ¶¶ 28–31).

(3) Coastal's 1995 Form 10–K informed investors that "the Company has initiated a major change in its information technology strategy which is based upon conversion of the Company's billing and collection operation to a common computerized system." The 1995 Form 10–K also referred to "an increase in the backlog of unprocessed billing information and increased processing time for bills." (Id. ¶¶ 34–35).

(4) The First Quarter 1996 Form 10–Q referred to "the continued adverse trend in collection experience." (Id. ¶ 39).

(5) Coastal's Second and Third Quarters 1996 Form 10–Q's advised investors of "lower net collections per patient visit by the Company's billing and accounts receivable management services division." (Id. ¶¶ 44, 49).

(6) Coastal's 1996 Form 10–K referred to "lower net collections per patient visit." (Id. ¶ 54). The 1996 Form 10–K also stated that "[t]he Company's number of days of revenue in average outstanding accounts receivable for 1996 and 1995 was 68.9 and 76.1 days respectively. This decrease was partially attributable to the implementation of a common computerized system to be used by all of the Company's billing operations." (Id. ¶ 85).

Despite Defendants' repeated references from 1995 to 1997 to losses caused by inefficiencies and backlogs in Coastal's billing system, Plaintiff alleges that these filings obscured the true state of affairs, and that in actuality Coastal's billing system was "practically non-functional" and "in a state of disarray." (Id. ¶¶ 21, 24). The true state of affairs was allegedly revealed for the first time on August 29, 1997, when Scott remarked at a shareholder's meeting that, prior to the installation of a single set of software, Coastal's billing unit had been "a mess" because the company had written software that did not work and had three sets of hardware and software that were not compatible. (Id. ¶ 66). As a result, Scott continued, Coastal "didn't send out bills for a year, and that hurts cash flow." (Id.).

The information that Plaintiff claims Defendants withheld from the market was not material as a matter of law. There is no question that Defendants accurately disclosed Coastal's operating expenses and accurately listed the different reasons for their net losses, including the backlogs in Coastal's billing system caused by a lack of standardization. There is also no question that on June 12, 1997, Defendants accurately disclosed in Coastal's 1996 Form 10–K the average number of days of revenue in outstanding accounts for 1995 and 1996 and accurately attributed the decrease in part to the implementation of a common computerized billing system.

Plaintiff claims that, in addition to this information, Defendants should have informed investors that the billing system

was "a mess," "in a state of disarray," and "practically non-functional." Such pejorative characterization would not have added anything to the total mix of information available about Coastal's problems with its billing system. The purpose of the securities law is to ensure that issuers provide investors with non-misleading information, not with all possible information. When issuers accurately and completely disclose their operating expenses and net losses and accurately and completely list all of the factors for these expenses and losses, pejorative descriptions of these factors are not required. Investors concern themselves primarily with facts, not with opinions or characterizations of facts. *See In re Donald J. Trump Casino Securities Litigation,* 7 F.3d 357 (3d Cir.1993) (stating that securities laws are concerned with disclosure of facts, not with the failure of defendants to characterize facts with pejorative nouns or adjectives); *Brogren v. Pohlad,* 960 F.Supp. 1401 (D.Minn.1997) (holding that defendants had no duty to point out a decline in sales that was already reflected in the diminished profitability disclosed by defendant); *Kowal v. MCI Communications Corp.,* 16 F.3d 1271 (D.C.Cir.1994) (reasoning that mere pejorative characterizations of disclosed factual matters will not alter the total mix of information available to the investing public and as such are immaterial as a matter of law); *Vosgerichian v. Commodore Int'l,* 862 F.Supp. 1371 (E.D.Pa.1994) (finding no actionable fraud in failing to report a price decrease where the defendant accurately reported both its large drop in earnings and its much smaller drop in sales). "The role of the materiality requirement is not to 'attribute to investors a childlike simplicity' but rather to determine whether a 'reasonable investor' would have considered the omitted information significant at the time." *Hillson,* 42 F.3d at 213 (quoting *Basic,* 485 U.S. at 232–34, 108 S.Ct. 978). Because Defendants informed investors of the backlogs and problems in Coastal's billing system that caused the company to incur expenses that contribut-ed to its financial decline, the more detailed description of the problems in the billing system which Plaintiff argues should have been disclosed is therefore immaterial as a matter of law.

Finding immateriality in the Defendants' failure to discuss the extent of the problems in Coastal's billing system is also consistent with the Fourth Circuit's decision in *Hillson.* While *Hillson* primarily dealt with forward-looking statements by the defendant Adage, Inc., the case also contained a claim based on Adage's failure to disclose in more detail certain problems associated with a subsidiary. In that case, Adage had issued quarterly reports detailing its performance and the performance of its subsidiary, Allister Access Controls, Inc. In a succession of quarterly reports, Adage had informed investors about "dire economic conditions" facing the industry upon which Allister's sales were dependent, about the termination of several of Allister's high-ranking executives, about Allister's losses of $1.2 million for the first six months of 1992, about Allister's two years of "continued unsatisfactory performance," and about continued management turnover at Allister. *Hillson,* 42 F.3d at 206–07. Some of Adage's shareholders filed a complaint alleging, *inter alia,* that the failure to disclose in more detail Allister's problems constituted an omission of material facts in violation of Section 10 and Rule 10b–5. The district court concluded that Adage's statements as to Allister's performance were not sufficiently material to support claims for securities fraud and dismissed the complaint.

The Fourth Circuit affirmed. The court of appeals held that Adage's failure to disclose in more detail Allister's problems did not constitute an omission of material facts. The court of appeals focused on the fact that the reports filed by the defendants had accurately and completely disclosed Allister's losses: "Both the annual report and the 10K disclosed that Allister had lost money in each of the three years preceding 1992, including a new operating

loss in 1991 alone of more than $1.5 million." *Id.* at 212. The court of appeals also discounted the fact that the earlier filings had not specifically identified Allister in connection with Adage's losses. *Id.* at 212 n. 6. Because Adage's reports had already placed information about Allister's losses in the public domain, the securities laws had been satisfied.

The plaintiff's claim in *Hillson* parallels Plaintiff's claim in this case. In both cases the defendants had disclosed the existence of certain specified problems in their operations and linked those problems to their disclosed operating losses. In both cases, the plaintiffs complained that the defendants should have described the issuing company's problems in greater detail. The Fourth Circuit rejected the plaintiff's complaint in *Hillson,* finding that the defendants put a reasonable investor on notice by placing information about the company's losses in the public domain. A similar result should obtain here, where the Defendants accurately and completely disclosed both Coastal's losses and its billing system's backlogs.

Defendants' alleged omissions in the First and Second Quarters 1997 Form 10–Q's are not actionable for an additional reason. In both reports Defendants disclosed a decline in net operating revenues for the first quarter of 1997, which was attributed to (1) the sale of certain assets, (2) contract attrition, and (3) less new business development. In neither report did Defendants mention Coastal's billing system or state that the billing system contributed to decreased revenues.

The portions of Coastal's First and Second Quarters 1997 Form 10–Q's cited by Plaintiff simply do not constitute material misrepresentations. In fact, these statements fail to contain any misrepresentation or misleading information whatsoever. Defendants made in these filings no affirmative representation about Coastal's billing system. Because the statements cited from Coastal's 1997 10–Q filings neither state nor imply any fact about Coastal's

billing system, they cannot possibly create any misleading impressions about the state of that system. *See Basic Inc.,* 485 U.S. at 239 n. 17, 108 S.Ct. 978 ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."). Moreover, as the court has already found, Defendants had no duty to disclose any additional information about Coastal's billing system because any additional disclosures would not have been material to a reasonable investor.

In short, because any pejorative description of Coastal's billing system would not have altered the total mix of information available to the market, Defendants' alleged misstatements or omissions are immaterial as a matter of law and therefore are not actionable under Section 10(b) and Rule 10b–5.

### B. *Failure to Satisfy the Pleading Requirements of the PSLRA*

The court also finds that the amended complaint fails to meet the requirements for pleading the element of scienter under the PSLRA. The PSLRA requires that "the complaint shall state with particularity facts giving rise to a *strong inference* that the defendant acted with required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). The PSLRA's legislative history indicates that the statute's "strong inference" language was "based in part" on a two-part analysis developed by the Second Circuit. H.R.Rep. No. 369, at 41 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 740. Under the Second Circuit's test, a plaintiff could properly plead scienter by alleging (1) facts showing that the defendants had both the motive and the opportunity to commit fraud or (2) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994).

Uncertainty as to whether Congress intended to adopt or strengthen the Second Circuit's standard has generated consider-

able debate among the federal courts. Several courts have held that the PSLRA's strong inference requirement is consistent with both the prongs of the Second Circuit test. *See e.g., Fugman v. Aprogenex, Inc.,* 961 F.Supp. 1190, 1195 (N.D.Ill.1997); *Rehm v. Eagle Fin. Corp.,* 954 F.Supp. 1246, 1252 (N.D.Ill.1997); *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.,* 927 F.Supp. 1297, 1311 (N.D.Cal. 1996). In contrast, other courts have held that Congress intended to adopt an even stricter standard that would eliminate the "motive and opportunity" prong of the Second Circuit standard and would require the plaintiff to set forth specific facts that "create a strong inference of knowing misrepresentation on the part of the defendants." *Norwood Venture Corp. v. Converse Inc.,* 959 F.Supp. 205, 208 (S.D.N.Y. 1997) (quoting *In re Silicon Graphics, Inc. Secs. Litigation,* 970 F.Supp. 746, 757 (N.D.Cal.1997)); *see also Novak v. Kasaks,* 997 F.Supp. 425 (S.D.N.Y.1998) (noting that the growing trend in the courts is to find that Congress intended to strengthen the Second Circuit's standard).

In this case the court does not need to decide whether the PSLRA adopts or strengthens the Second Circuit's strong inference standard because the amended complaint is insufficient even under the more lenient Second Circuit test. First, Plaintiff has failed to adequately allege that any of the Defendants had a motive to commit fraud. "Motive would entail concrete benefits that could be realized by one or more of the following statements and wrongful disclosures alleged." *Shields,* 25 F.3d at 1130. Plaintiff's surreply does not identify what allegations in the amended complaint address Defendants' alleged motive for committing fraud. Nevertheless,

the court has identified the following allegations which attempt to allege motive:

> The purpose and effect of said scheme, plan and unlawful course of conduct was, among other things, to induce plaintiff and the other members of the Class to purchase Coastal Physician Group common stock during the Class Period at artificially inflated prices.
>
> . . . .
>
> Each of the Individual Defendants so acted for the purposes of falsely enhancing the public perception of the financial condition of Coastal, and, ultimately, protecting and entrenching their own position, perquisites, and emoluments and/or inflating the prices that could be obtained on the sale of their Coastal Securities.

(Pl.'s Am.Compl. ¶¶ 70, 85). These allegations fall well short of an adequate allegation of motive. It is well settled that "a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold." *Shields,* 25 F.3d at 1130. Plaintiff has not set forth specific facts identifying concrete benefits which Defendants could realize through the alleged fraud, such as an effort by management to sell their own shares, to acquire assets in exchange for Coastal stock, or to delay a criminal prosecution. *See id.* The closest such allegation is Plaintiff's conclusory assertion that the individual Defendants sought to inflate the price that could be obtained on the sale of their Coastal stock. However, Plaintiff has not alleged any specific facts which raise a strong inference that any of the individual Defendants engaged in such activity.[3] Accordingly, Plaintiff has failed to adequately allege facts which raise a

---

3. Notably, the second quarter 1997 Form 10–Q indicates that Scott actually made a substantial investment in Coastal just prior to his statements about the billing system at the August 1997 shareholders' meeting. On June 9, 1997, Scott invested $10 million in cash in Coastal for 1,000,000 shares of Series C Convertible Preferred Stock (Convertible Preferred Stock). Scott also received 84,983 shares of Convertible Preferred Stock and 240,000 shares of Common Stock in exchange for certain obligations owed to him by Coastal. The Convertible Preferred Stock was convertible to 10,849,830 shares of common stock subject to approval by Coastal shareholders at the 1997 annual shareholders meeting. Second Quarter 1997 10–Q at 12.

strong inference that Defendants had a motive to commit fraud.

Plaintiff has also failed to satisfy the second prong of the Second Circuit's test because she has not alleged facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. Plaintiff's Amended Complaint is replete with conclusory allegations—that Defendants "knowingly or recklessly engaged in acts . . .," (Pl.'s Am.Compl. ¶ 70), or "had actual knowledge or the materially misleading statements and the material omissions set forth herein . . . [or] acted with reckless disregard for the truth," (*Id.* at ¶ 72)—which do not raise a strong inference of conscious misbehavior or recklessness. It is well settled that "in the context of securities fraud claims . . . such allegations are 'so broad and conclusory as to be meaningless.'" *Shields,* 25 F.3d at 1129 (statements that the defendants "knew but concealed" some things, or "knew or were reckless in not knowing" other things held insufficient) (quoting *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 119–20 (2d Cir.1982)).

Beyond these conclusory allegations, all that Plaintiff relies upon are Scott's statements at the 1997 shareholders' meeting. Plaintiff contends that these statements establish that Defendants acted with scienter because they show that Defendants had knowledge of the adverse information about the billing system. (Pl.'s Surreply at 6). The court disagrees. As the court has emphasized previously, Plaintiff does not allege that Defendants concealed or misstated Coastal's declining financial condition over the course of the Class Period, and Coastal's filings with the SEC consistently identify problems with its billing system and expenses associated with transition to a new system as part of the cause of Coastal's financial woes. Given these undisputed facts, Scott's statements at the shareholders' meeting, which were merely

pejorative characterizations of these facts, do not raise a strong inference that Scott, or any other defendant, was promoting a fraud.

In sum, Plaintiff's failure to allege any material misrepresentations or omissions and failure to meet the pleading requirements of the PSLRA with respect to the element of scienter are fatal to her claim under Section 10(b) and Rule 10b–5, and that claim is dismissed.

## II. *Plaintiff's Remaining Claims*

■ Plaintiff's failure to state a claim for a primary securities fraud violation also precludes a finding of "control person" liability for the individual Defendants. Therefore, the court will also dismiss Plaintiff's claim against the individual Defendants for a violation of Section 20(a) of the Exchange Act. 15 U.S.C. § 78t(a); *Weill v. Dominion Resources, Inc.,* 875 F.Supp. 331, 339 (E.D.Va.1994) (holding that a Section 20(a) claim for controlling person liability must fail where there is no underlying liability under some provision of the Exchange Act). Finally, in view of the fact that Plaintiff's federal securities law claims have been dismissed, the court declines to exercise its supplemental jurisdiction over Plaintiff's state law claim against the individual Defendants for negligent misrepresentation. 28 U.S.C. § 1367(c)(3). Accordingly, the court will dismiss Plaintiff's amended complaint in its entirety.[4]

## CONCLUSION

For the foregoing reasons, the court will grant Defendants' motion to dismiss.

An order in accordance with this memorandum opinion shall be entered contemporaneously herewith.

---

4. The posture of this case does not require consideration of Plaintiff's class action allegations. *See* 7B Charles A. Wright, Arthur R.

Miller and Mary Kay Kane, *Federal Practice and Procedure* § 1798 (2d ed.1986).